**[J-46-2022]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | |
|---|---|
| COUNTY OF FULTON, FULTON COUNTY BOARD OF ELECTIONS, STUART L. ULSH, IN HIS OFFICIAL CAPACITY AS COUNTY COMMISSIONER OF FULTON COUNTY AND IN HIS CAPACITY AS A RESIDENT, TAXPAYER AND ELECTOR IN FULTON COUNTY, AND RANDY H. BUNCH, IN HIS OFFICIAL CAPACITY AS COUNTY COMMISSIONER OF FULTON COUNTY AND IN HIS CAPACITY AS A RESIDENT, TAXPAYER AND ELECTOR OF FULTON COUNTY, | : No. 3 MAP 2022<br>:<br>: Appeal from the Order of the<br>: Commonwealth Court at No. 277<br>: MD 2021 dated January 14, 2022.<br>:<br>: SUBMITTED: October 21, 2022<br>:<br>:<br>:<br>:<br>:<br>:<br>: |
| Appellees | : |
| v. | : |
| SECRETARY OF THE COMMONWEALTH, | : |
| Appellant | : |

**OPINION**

**JUSTICE WECHT**                                              **DECIDED: April 19, 2023**

This Opinion concerns a party's defiance of an order issued by this Court. The underlying litigation began well over a year ago, prompted by the Secretary of the Commonwealth's decertification of certain voting equipment that Fulton County acquired from Dominion Voting Systems, Inc. ("Dominion") in 2019 and used in the 2020 general

election.  The Secretary[1] decertified the voting equipment after learning that, following the 2020 election, Fulton County had allowed Wake Technology Services, Inc. ("Wake TSI"), to perform a probing inspection of that equipment as well as the software and data contained therein.  The Secretary maintained that Wake TSI's inspection had compromised the integrity of the equipment.  Fulton County and the other named Petitioner-Appellees[2] filed a Petition for Review in the Commonwealth Court's original jurisdiction challenging the Secretary's decertification authority generally and as applied in this case.

During the pleading stage, the Secretary learned that Fulton County intended to allow another entity, Envoy Sage, LLC, to inspect the allegedly compromised equipment.  The Secretary sought a protective order from the Commonwealth Court barring that inspection and any other third-party inspection during the litigation.  The court denied relief.  The Secretary appealed that ruling to this Court, and we entered a temporary order on January 27, 2022, to prevent the inspection and to preserve the *status quo* during our review of the Secretary's appeal.  Months later—and with no public consideration, official proceedings, or notice to the courts or other parties to this litigation—the County allowed still another party, Speckin Forensics, LLC ("Speckin"), to inspect the voting equipment and electronic evidence at issue in this litigation.  Upon learning of this alleged violation

---

[1]    Over the course of this litigation, various individuals have served and/or acted in this capacity.  Because the office's litigation position has not varied, we refer to "the Secretary" throughout this Opinion.

[2]    Throughout this Opinion we primarily use "Fulton County" or "the County" to refer collectively to Petitioner-Appellees.  However, especially later in this Opinion, particularly where we detail our disposition of this matter, those terms sometimes will refer to Fulton County strictly in its own right.

of our temporary order, the Secretary filed an "Application for an Order Holding [the County] in Contempt and Imposing Sanctions" ("Sanctions Application"). That application is the central concern of this Opinion.

After our preliminary review of the Secretary's application for sanctions, this Court appointed President Judge Renée Cohn Jubelirer of the Commonwealth Court as Special Master to make an evidentiary record and to provide proposed findings of fact, conclusions of law, and sanctions (if warranted) to aid in this Court's resolution of the allegations at issue. Notwithstanding a convoluted case, an expedited schedule, and the remarkable obstinacy of Fulton County and its counsel, the Special Master performed her task admirably. In her timely, painstaking "Report Containing Proposed Findings of Fact and Recommendations" ("Special Master's Report" or "SMR"), President Judge Cohn Jubelirer recommended that this Court impose several sanctions upon Fulton County, but did not impose sanctions upon the other Petitioner-Appellees or Thomas Carroll, the attorney who represented them during the relevant period.

There can be no orderly and effective administration of justice if parties to litigation do not comply with court orders. Our close review makes clear that Fulton County willfully violated an order of this Court. As well, we find that Fulton County and its various attorneys have engaged in a sustained, deliberate pattern of dilatory, obdurate, and vexatious conduct and have acted in bad faith throughout these sanction proceedings. Taken as a whole, this behavior prompts us to sanction both the County and Attorney Carroll. The details follow.

I.      **The Original Action and Interlocutory Appeal to This Court**[3]

        A.      **Wake TSI's Inspection of Fulton County's Dominion Voting Equipment and the Secretary's Consequent Decertification**

Fulton County formerly utilized Dominion's Democracy Suite 5.5A Election Management System ("EMS").[4]  The County leased the EMS from Dominion in April 2019. The County used it for the first time in that year's municipal elections and used it again in the 2020 primary and general elections.

In December 2020, the County's Board of Commissioners, whose members also constituted the County's Board of Elections, retained Wake TSI to analyze aspects of the November 2020 election in Fulton County.[5]  Wake TSI personnel visited the County offices containing the voting equipment, where they "collected electronic copies of EMS application log files, directory information, digital images of the scanned ballots, Operating System (OS) directory and file information, OS log files and pictures of the paper Mail-In ballots."[6]  The company claimed that an "IT Support Technician, or an Election

---

[3]      Much of the account that follows is based upon matters over which we may take judicial notice, and/or undisputed assertions of fact substantiated by the parties' pleadings and attachments in the underlying litigation, the interlocutory appeal, and these sanction proceedings.  Our recitation finds further support in the Special Master's Report.  For ease of reference, we attach a copy of the Special Master's Report to this decision.

[4]      "EMS" is a term that covers all devices and software involved in running an election.  Depending on context, we refer to it primarily as "voting equipment."  The United States Department of Homeland Security broadly has identified electronic voting systems as "critical infrastructure."  *See* U.S. Dep't of Homeland Security, *Statement by Sec. Jeh Johnson on the Designation of Election Infrastructure as a Critical Infrastructure Subsector* (Jan. 6, 2017), available at https://www.dhs.gov/news/2017/01/06/statement-secretary-johnson-designation-election-infrastructure-critical.

[5]      *See* Fulton Cty. Pa. Election Sys. Analysis, Amended Pet. for Review, 9/17/2021, Ex. E ("Wake TSI Report").

[6]      Wake TSI Report at 8-9.

Commissioner, remained with the technical team during the assessment of the voting systems and was the only person to access, copy or download information from the EMS."[7]

Wake TSI claimed to have identified "five issues of note," including a ballot scanning error rate of 0.005%, which exceeded the error rate set by the federal government (.0004%),[8] and Dominion's installation on the EMS server of what Wake TSI described as a "software toolbox [that] allows any user with access to change and manipulate the EMS databases without logging (recording) to the Database, EMS or OS logfiles."[9] Wake TSI asserted that this software "makes the system certification invalid."[10] Wake TSI also opined "that the [2020] election [in Fulton County] was well run, was conducted in a diligent and effective manner[,] and followed the directions of the Commonwealth."[11]

On July 8, 2021, having learned that Fulton County had provided third-party access to the County's voting equipment and that other counties had considered retaining outside parties to review and digitally copy their voting systems, the Secretary issued "Directive 1," invoking the Secretary's authority under the Pennsylvania Election Code.[12]

---

[7]     *Id*. at 9.

[8]     *Id.* at 11-12.

[9]     *Id.* at 26.

[10]    *Id.*

[11]    *Id.* at 5.

[12]    Pet. for Review, Ex. F (invoking 25 P.S. § 3031.5(a)) ("Directive 1"). The full title of Directive 1 is "Directive Concerning Access to Electronic Voting Systems, Including but Not Limited to the Imaging of Software and Memory Files, Access to Related Internal (continued…)

The Secretary determined that third-party access to election-related electronic infrastructure "undermines chain of custody requirements and strict access limitations necessary to prevent both intentional and inadvertent tampering"; "jeopardizes the security and integrity of those systems"; and "negate[s] the ability of electronic voting system vendors to affirmatively state that such systems continue to meet Commonwealth Security standards, are validated as not posing security risks, and are able to be certified to perform as designed by" the vendor.[13]

> Directive 1 limits third-party access to "Electronic Voting Systems" as follows:
>
> a. County Boards of Elections shall not provide physical, electronic, or internal access to third parties seeking to copy and/or conduct an examination of state-certified electronic voting systems, or any components of such systems . . . .
>
> b. If access described in Paragraph 3.a. occurs, those pieces of voting equipment will be considered no longer secure or reliable to use in subsequent elections. As a result, the Department of State will withdraw the certification or use authority for those pieces of the county voting system. . . .
>
> c. The Commonwealth of Pennsylvania will not reimburse any cost of replacement voting equipment for which certification or use authority has been withdrawn pursuant to this directive.[14]

Directive 1 also requires boards of elections to "notify the Secretary immediately upon receipt of any written or verbal request for third-party access to an electronic voting

---

Components, and the Consequences to County Boards of Allowing Such Access." Section 3031.5(a) authorizes the Secretary to "issue directives or instructions for implementation of electronic voting procedures and for the operation of electronic voting systems." Exhibit F is attached to the County's original Petition for Review but missing from its Amended Petition.

13      Directive 1 at 2-3 ¶2.

14      *Id.* at 2 ¶3.

system, or any component thereof," and directs both elections boards and "voting system vendors . . . to notify the Secretary immediately of any breach or attempted breach in the chain of custody of its voting system components."[15]

According to the Secretary, Fulton County election officials "confirmed" that the County had "allowed Wake TSI . . . access to certain key components," including the "election database, results files, and Windows system logs," and had also allowed the company to use a "'system imaging tool to take complete hard drive images of [certain election-related] computers' and 'complete images of two USB thumb drives' used to transfer results files from their voting system computers to the computers used to upload results to the state's voter registration and election results reporting system."[16] The Secretary determined that the County's system had been "compromised" and that "neither Fulton County; [Dominion]; nor the [Secretary] can verify that the impacted components of Fulton County's leased voting system are safe to use in future elections."[17] Accordingly, the Secretary decertified the voting equipment that Fulton County used in the November 2020 election.[18]

### B. Fulton County's Petition for Review Challenging the Secretary's Exercise of Decertification Authority

On August 18, 2021, Fulton County; the Fulton County Board of Elections; and Stuart L. Ulsh and Randy H. Bunch—individually and in their official capacities as County

---

[15]     *Id.* at 2 ¶4.

[16]     Petition, Ex. H, Letter from Pa. Dep't of State to Counsel for the Fulton Cty. Bd. of Elections, 7/20/2021, at 1-2.

[17]     *Id.* at 2.

[18]     *Id.*

Commissioners—filed a Petition for Review against the Secretary in the Commonwealth Court's original jurisdiction. The County challenged the Secretary's authority to promulgate Directive 1 and sought vacatur or reversal of the Secretary's decertification of the County's voting equipment and/or its denial of Fulton County's access to state funds to cover the costs of replacing the decertified equipment.

The County asserted in Count I that the decertification was "arbitrary, capricious, and legally improper, and an error of law, as [the Secretary] failed to comply with the mandates of 25 P.S. § 3031.5(b)" by not conducting a physical reexamination of the County's EMS before decertifying it.[19] The County asserted that, if the Secretary "had conducted the mandated reexamination of" the County's EMS, it "would have found that" the EMS "continued to meet" the Election Code's security requirements.[20]

In Count II, the County sought a declaratory judgment that the County has authority to allow a third-party vendor to examine and analyze its EMS.[21] The County contended that, by "forbid[ding] any use of third-party vendors to conduct an examination of various components of" its EMS and doing so six months *after* the County "engaged Wake TSI to assist [the County] in conducting its 'analysis,'" the Secretary contradicted the Secretary's own 2016 and 2020 guidance documents.[22] These documents, the County argued,

---

[19]     Amended Pet. at 14 (Count I).

[20]     *Id.* at 14 ¶48.

[21]     *Id.* at 15-19.

[22]     *Id*. at 15-16. The County argues that the Secretary's September 2016 "Guidance on Electronic Voting System Preparation and Security," *id*., Ex. C ("2016 Guidance"), "expressly contemplates the use of third-party vendors for electronic voting system preparation and security," 2016 Guidance at 7 ¶24, because the 2016 Guidance recommends procedures to employ "[i]f a county uses an outside vendor to perform any (continued…)

generally anticipated counties' use of third-party vendors, and the County asserted that the "analysis and investigation of [the EMS] with the assistance of Wake TSI was conducted in accordance with the requirements of the [Code] as well as the [Secretary's] then-current Guidance."[23]

Count II concluded with the following prayer for relief:

> Petitioners respectfully request that this Honorable Court enter an Order declaring that Petitioners . . . complied with the requirements of the Election Code and the Guidance issued by [the Secretary] in retaining and utilizing [Wake TSI] to assist [them] in conducting an analysis of Fulton County's Election System, and further declaring that any finding to the contrary by [the Secretary] should be stricken[,] and further declaring the July 20, 2021 decertification by the Secretary null and void and of no effect . . . .[24]

This aspect of the pleading dovetailed with Fulton County's claim that, had the Secretary inspected the voting equipment before decertifying it, the Secretary would have found that it continued to meet the Election Code's requirements for certification. In both regards, the County made assertions whose veracity might ultimately hinge upon disputed factual claims pertaining to the voting equipment's condition after Wake TSI's inspection.

In Count III, the County sought declaratory judgment to the effect that, in issuing Directive 1, the Secretary usurped the County's Board of Elections' "power . . . to conduct a systematic and thorough inspection" of its elections with the assistance of third-party

---

of the election preparation tasks." *Id*. (quoting 2016 Guidance at 1); *cf.* Amended Petition, Ex. D ("2020 Guidance") (updating the 2016 Guidance but preserving the reference to third-party vendors).

[23]     Amended Petition at 18 ¶64.

[24]     *Id*. at 19.

entities.[25]  In Count IV, the County sought a declaration that the Secretary lacks authority to withhold funds from the County to purchase replacement machines.[26]  In Count V, the County sought injunctive relief in furtherance of the foregoing claims.[27]

The Secretary filed Preliminary Objections demurring only to Count III.  The Secretary emphasized that the General Assembly delegated to the Secretary the authority to examine, approve, and reexamine voting systems and to issue directives or instructions for electronic voting procedures.  The Secretary also noted that the General Assembly tasked the Secretary with determining whether a county's EMS "can be safely used by voters at elections as provided" in the Election Code.[28]

### C.  The Secretary Seeks to Prevent a Third-Party Inspection During the Litigation of the Petition for Review

On November 29, 2021, the Secretary discovered "a meeting agenda posted online" indicating that the Fulton County Board of Commissioners would vote on a motion the next day to allow the Senate Intergovernmental Operations Committee ("Senate Committee") to examine the County's voting equipment.[29]  When contacted by the Secretary's counsel, Attorney Michele D. Hangley, counsel for the County, Attorney Thomas W. King, III, explained that the vote was not going forward and that the County

---

[25]     *Id.* at 20 ¶73

[26]     *See id.* at 20-22.

[27]     *See id.* at 22-25.

[28]     Preliminary Objections, 10/18/2021, at 6 ¶¶15-16, 7 ¶17 (citing 25 P.S. § 3031.5(a)).

[29]     Emergency Application for an Order Prohibiting Spoliation of Key Evidence Scheduled to Occur on Dec. 22, 2021, 12/17/2021, at 5 ("Emergency Application") (quoting Fulton Cty. 11/30/2021 Meeting Agenda, Ex. A).

had not received a request from the Senate Committee.[30] Attorney King indicated that the County intended to return its voting equipment to Dominion, but was considering first making it available to another third-party for additional inspection.[31] Attorney Hangley responded "that such an 'inspection' threatened to spoliate evidence central to Petitioners' claims," and reminded Attorney King that the Secretary had "requested that the Department of State be given plenty of notice of any vote on or scheduling of any inspection."[32]

On December 10, Senator Cris Dush, who had replaced Senator Doug Mastriano as Chair of the Senate Committee, wrote the County seeking "[p]ermission to collect the digital data from the election computers and hardware used by [the County] in the November 2020 election" as part of the Senate Committee's investigation of the Commonwealth's election system.[33] On December 14, the Secretary learned—again from the County's website rather than from direct notice—that Fulton County's Commissioners had voted the same day to permit the inspection to go forward the

---

[30] *Id.* (citing Email from Attorney Thomas W. King, III, to Attorney Michele D. Hangley, 11/29/2021, Ex. B).

[31] *Id.* (citing Letter from Attorney Hangley to Attorney King, 12/7/2021, Ex. C).

[32] *Id.* at 5-6 (quoting Ex. C, *supra*) (internal quotation marks omitted).

[33] *Id.*, Ex. D (Letter from Senator Dush to Fulton County, 12/10/2021). Senator Dush is now Vice-Chair of the Committee. The Democratic Senators who sat on the Senate Committee at the relevant time in 2021 and 2022—Anthony H. Williams, Jay Costa, Vincent J. Hughes, and Steven J. Santarsiero—filed a brief as *amici curiae* supporting the Secretary. They averred that then-Chairman Dush "unilaterally selected Envoy Sage . . . as the vendor to perform this 'investigation'" "[t]hrough a no-bid process that was not made public or . . . shared with the Democratic Senators." Democratic Senators' Br. at 2. The Committee is now chaired by Senator Jarrett Coleman, and the overall composition of the Committee has changed significantly during the intervening months.

following week.[34]  Attorney Hangley learned from Attorney King that the inspection was scheduled for December 22 and was to be conducted by Envoy Sage, which the Secretary characterized as "a recently formed company with no election experience, no apparent physical presence, and, at most, two identifiable employees."[35]  Attached to Attorney King's letter "was a single page, containing less than a half-page of text," that described Envoy Sage's "protocol" for the inspection.[36]  The "so-called 'protocol' provide[d] no details" and "conclusorily assert[ed] that Envoy Sage 'will follow proper procedure for collection and chain of custody.'"[37]

On December 17, 2021, concerned that the County would disregard the Secretary's request that it refrain from turning its voting equipment over to Envoy Sage, the Secretary filed an Application for Emergency Relief.  The Secretary's Application sought to "enjoin [the County's] planned 'inspection' and require them to preserve voting equipment and data."[38]  Attached to the application was the affidavit of the Secretary's expert, Ryan Macias.  Mr. Macias is a voting technology consultant with more than sixteen years' experience in "election technology, security, and policy," who previously served as the Acting Director of the United States Election Assistance Commission, which assesses the security, accuracy, and accessibility of voting systems nationwide.[39]  There,

---

[34]  *See* Emergency Application at 6.

[35]  *Id*. at 9 (citing Letter from Attorney King to Attorney Hangley, 12/16/2021, Ex. F).

[36]  *Id*. at 10.

[37]  *Id.*

[38]  *Id.* at 11 (capitalization normalized).

[39]  Emergency App., Ex. L (Affidavit of Ryan Macias, 12/17/2021), at 2-3 ¶5.

Mr. Macias "managed multiple voting system applications and testing campaigns including the Dominion [system] used in Fulton County."[40]

Mr. Macias attested that he reviewed the County's plan to grant Envoy Sage access to its voting equipment, and "took part in a limited inspection of" that equipment on October 13, 2021, "as part of a preliminary effort to determine whether any of the compromised machines could potentially be 'sanitized' in a way that would allow their reuse."[41] Mr. Macias observed that "[t]he Envoy Sage Protocol is highly irregular and does not conform to any type of industry standard for such a document."[42] He found the absence of proper protocols "particularly alarming" because "the equipment in question includes electronic data which can be easily altered—intentionally or unintentionally—without ever dismantling any hardware or even touching a keyboard."[43] "[O]nce such data [are] altered, it may be difficult, if not impossible, to trace things back to determine the *status quo ante*, *i.e.*, to see what data, if any, was altered, and how."[44] Mr. Macias concluded that the Envoy Sage inspection "could irrevocably undermine the ability to review, examine, or analyze the condition of the equipment and data as it existed prior to Envoy Sage's activities."[45]

---

[40]  *Id.*

[41]  *Id.* at 4 ¶6.

[42]  *Id.* at 6 ¶10.

[43]  *Id.* at 6 ¶12.

[44]  *Id.*

[45]  *Id.*

In support of the Emergency Application, the Secretary cited our decision in *Pyeritz v. Commonwealth*,[46] wherein this Court observed that "parties to pending and prospective suits, upon an appropriate showing, may be able to obtain injunctive relief to preserve evidence," and pointed to several "factors for obtaining such relief" drawn from the United States District Court's decision in *Capricorn Power Co. v. Siemens Westinghouse Power Corp*:

> (1) the level of concern the court has for the continuing existence and maintenance of the integrity of the evidence in question in the absence of an order directing preservation of the evidence;
>
> (2) any irreparable harm likely to result to the party seeking the preservation of evidence absent an order directing preservation; and
>
> (3) the capability of an individual, entity, or party to maintain the evidence sought to be preserved, not only as to the evidence's original form, condition or contents, but also the physical, spatial and financial burdens created by ordering evidence preservation.[47]

After analyzing each factor, the Secretary requested an order preventing the County "from providing any third party (other than [Dominion]) with access to the electronic voting machines in Fulton County's possession . . . including but not limited to allowing the inspection by Envoy Sage currently scheduled for December 22, 2021," and requiring Petitioners to "take all necessary steps . . . to preserve those machines, and any data stored thereon, in a secured and unaltered state pending further order of the Court."[48]

---

[46] 32 A.3d 687, 694 (Pa. 2011).

[47] *Capricorn Power Co. v. Siemens Westinghouse Power Corp.*, 220 F.R.D. 429, 433-34 (W.D. Pa. 2004)

[48] Emergency App. at 17.

In its response, Fulton County asserted that "[t]he electronically stored information at issue is the primary evidence in this case" and that the voting equipment had "already been inspected by third-party representatives of the [Secretary], who is now trying to prohibit the Petitioners from conducting their own inspection of the evidence in this case."[49] Thus, Petitioners implied that they did not reap sufficient evidence from Wake TSI's investigation to pursue this litigation, but rather required a *second* inspection specifically to obtain such evidence.

After the parties presented argument before the Commonwealth Court, President Judge Emerita Mary Hannah Leavitt postponed the planned inspection to January 10, 2022, "by which time," the court optimistically suggested, "the parties will have negotiated protocols for said inspection."[50] The parties did not meet the court's expectations, and a continuing pattern of failed negotiations and court-ordered delays followed. On January 11, the court issued an order that deferred the planned inspection until January 14 and directed the parties to "continue negotiating protocols that will apply to

---

[49] Petitioners' Answer to Respondent's Emergency Application for an Order Prohibiting Spoliation of Key Evidence, 12/20/2021, at 17 ("Answer to Emergency App.").

[50] Order, 12/21/2021. In the interim, Dominion moved to intervene to enforce its contract with the County, specifically insofar as it "expressly prohibits the County" "from '[t]ransfer[ring] or copy[ing] onto any other storage device or hardware or otherwise copy[ing] the Software in whole or in part except for purposes of system backup.'" Emergency App. of Dominion Voting Sys., Inc. for Leave to Intervene for the Limited Purpose of Seeking a Protective Order, 1/3/2022, at 2, 3 ¶4 (quoting Software License Terms and Conditions at 2, § 5.1, Ex. B). The lower court denied Dominion's application. Dominion appealed this order at 4 MAP 2022. On March 21, 2022, this Court reversed. Since then, Dominion has participated in the Secretary's appeal and these sanction proceedings consistently with the limited interest it asserted in support of intervention.

said inspection."[51]  The parties again failed to reach an agreement, so the Secretary filed another application to prevent the inspection.[52]

In the Renewed Application, the Secretary again sought to bar the Envoy Sage inspection, citing various irregularities and uncertainties in the inspection proposed as well as concerns about Envoy Sage itself.  The Secretary noted the Secretary's own inability to participate in the inspection sufficiently to protect its interests and to monitor whether and to what extent the equipment and data are compromised.  The Secretary observed that it had "no reasonable assurance that the inspection will not spoliate key evidence in this case."[53]  The Secretary further proposed that, "[t]o the extent any inspection is allowed to proceed, it should be required to take place as party discovery in this case, subject to a strict protective order prohibiting disclosure to any third parties."[54]  The Secretary's argument and Mr. Macias's supporting affidavit relied upon the global proposition that *any* further inspection of the EMS risked irrevocably compromising the evidentiary value of the voting equipment to the resolution of any of the County's claims that might be affected by questions of fact informed by measurable aspects of the machines.[55]

---

[51]  Commonwealth Court Order, 1/11/2022.

[52]  Renewed Emergency App. for an Order to Enjoin the Third-Party Inspection Currently Scheduled for January 14, 2022, From Proceeding, 1/13/2022 ("Renewed Application").

[53]  *Id*. at 20.

[54]  *Id*.

[55]  *See*, *e.g.*, *id*. at 4 ("Envoy Sage has failed to provide a set of specific, step-by-step inspection procedures that conform to industry standards and provide reasonable assurance that the inspection will not spoliate the evidence."), 5 ("[T]he planned (continued…)

In opposing the Renewed Application, Fulton County abandoned its former assertion that the Envoy Sage inspection was critical to developing the factual record in furtherance of the County's own Petition for Review, disclaiming for the first time *any* interest in the condition or recertification of its voting equipment—or, strikingly, any data obtained from the Envoy Sage search that it was fighting to enable. Now, the County framed its challenge solely as a question of law testing the authority that the Election Code confers upon the Secretary to decertify the County's voting equipment, to take other remedial actions, and more generally to issue Directive 1 or similar orders in the future.[56]

Shortly after 10:00 a.m. on Friday, January 14—hours before the scheduled inspection—the Commonwealth Court denied the Secretary's Renewed Application and refused to enjoin the inspection. The court acknowledged *Capricorn Power*'s three-factor balancing test, but found that the Secretary failed "to demonstrate a critical element of each of the three factors—that the data or state of the System subject to inspection constitutes *evidence* in this matter worthy of protection."[57] The court found that the

---

inspection pose[s] an obvious and substantial risk of spoliating important evidence in this case."), 12-13 ("[I]maging the entire electronic voting system . . . creates a significant risk of spoliation . . . ."); *see also id.*, Ex. A (reproducing numerous draft inspection protocol agreements that appear to reflect the parties' failed negotiation, all drafts focusing substantially upon the general risk of spoliation and chain of custody concerns arising from the proposed inspection).

[56] *Compare* Answer to Emergency App. at 17 ("The electronically stored information at[ ]issue is the primary evidence in this case.") *with* Answer to Renewed App. at 6 (averring that Envoy Sage was retained solely by, and at the behest of, the Senate Committee; stating that the County "will not receive any of the data retrieved from the investigation," which will be controlled by the Committee; and bemoaning the burdens that last-minute delays of inspections (in which it disclaimed *any* interest) imposed upon Envoy Sage "and the Committee itself").

[57] Memo. & Order, 1/14/2022, at 3-4 (Leavitt, P.J.E.) (citing *Pyeritz*, 32 A.3d at 694) (emphasis in original).

Secretary had failed to establish that it or the County would "use any data obtained from the System as evidence in this proceeding."[58]   The court accepted at face value the County's insistence that it raised only a legal challenge to the Secretary's decertification authority.  Thus, the court determined that "[t]he inspection, and the data it may generate or alter, are not evidence in this matter."[59]

### D.    The Secretary's Appeal to this Court and its Emergency Application for a Stay

That same day, immediately before the 1:00 p.m. inspection was to begin, the Secretary filed an appeal to this Court together with an Emergency Application for a Stay ("Stay Application"), which this author granted on a temporary basis in order to preserve the *status quo* pending review by the full Court.  On January 27, 2022, the full Court extended that stay pending final resolution of the Secretary's appeal—which does not concern the underlying challenge to the Secretary's authority, but *only* the Secretary's effort, denied by the Commonwealth Court, to secure Fulton County's voting equipment from further inspections while that underlying challenge is litigated in full.

It is important to the reasoning that follows to review critical highlights of the Stay Application.  In providing a brief, pointed account of the foregoing history of this case, the Secretary expressed incredulity:

> [D]espite the consequences of [the County's] earlier decision to allow third-party access to Fulton County's electronic voting equipment, and despite the fact that this equipment—in particular, its status and condition following Wake TSI's "examination"—is essential evidence in this case, [the County] decided to allow *yet another third party* to access that equipment and manipulate its data.  And, once again, [the County] made this decision without providing advance notice to the Secretary, who is not only

---

[58]    *Id.* at 4.

[59]    *Id.*

Pennsylvania's "chief election official," charged with the statutory responsibility to protect the security of electronic voting equipment, . . . but is also a litigant with discovery rights that [the County is] obligated to respect, *see*, *e.g.*, [Pennsylvania Rule of Professional Conduct] 3.4 (requiring "[f]airness to [o]pposing [p]arty and [c]ounsel" and prohibiting the "unlawful[] alter[ation], destr[uction] or conceal[ment of] a document or other material having potential evidentiary value").[60]

Because our consequent orders granting the Secretary temporary relief lie at the heart of the County's defense to the Sanctions Application, we reproduce them in full. First, on January 14, 2022, this author issued a single-Justice temporary order pending review by the full Court.

> **AND NOW**, this 14th day of January, 2022, [the Secretary's] "Emergency Application to Stay Third-Party Inspection of Electronic Voting System Scheduled to Begin at 1:00 p.m. on January 14, 2022" is **GRANTED**, on a temporary basis, pending consideration of the request by the full Court.
>
> **IT IS FURTHER ORDERED** that the inspection of Fulton County's electronic voting equipment that is currently scheduled to begin at 1:00 p.m. on January 14, 2022, is hereby **STAYED** and **ENJOINED** pending further Order of the Court.

On January 27, the full Court extended the stay until we could resolve the Secretary's appeal:

> **AND NOW**, this 27th day of January, 2022, Respondent-Appellant's "Emergency Application to Stay Third-Party Inspection of Electronic Voting System Scheduled to Begin at 1:00 p.m. on January 14, 2022" is **GRANTED**. The single-Justice Order entered on January 14, 2022, staying the lower court's ruling and enjoining the proposed third-party inspection of Fulton County's electronic voting equipment, shall remain in effect pending the disposition of the above-captioned appeal.

Thus, our January 27 Order adopted and extended the effect of the January 14 Order's throughout the pendency of the Secretary's interlocutory appeal.

---

[60]     Stay App., 1/14/2022, at 5-6 (emphasis and modifications in original).

The proceedings challenging the Secretary's decertification authority continued while the January 27 Order remained in effect and this Court considered the pending appeal. Meanwhile, on April 12, 2022, at a public meeting, the Fulton County Commissioners voted unanimously to terminate the engagement of the attorneys who had represented the Commissioners to that date in the instant litigation. As well, a majority of the Fulton County Commissioners—Commissioner Paula J. Shives voting "nay"—voted to appoint Pennsylvania Attorney Thomas Carroll and Michigan Attorney Stefanie Lambert to represent the County moving forward.[61] At noon on that same day, Commissioner Ulsh signed out a key to the locked room in which the voting equipment at issue was stored.[62]

On May 17, 2022, this Court issued an order scheduling oral argument on the appeal for our September session in Philadelphia. In addition to reproducing the Secretary's issues as stated, we "further directed [the parties] to provide supplemental

---

[61]    Commissioner Shives is a petitioner in this litigation in her capacity as a member of the Fulton County Commission and its Board of Elections, not individually. She testified that she voted to terminate former counsel's representation in furtherance of her belief that the County should drop the instant litigation entirely. *See* Notes of Testimony ("N.T."), 11/9/2022, at 282-84; *see also id*. at 284 ("I'm not in favor of these lawsuits and I just think having a special counsel just keeps them going.").

[62]    *See* Secretary's Application to Admit into Evidence the Key Access Log Belatedly Produced by Petitioners, 11/18/2022, Ex. 1. The Secretary asked the Special Master to admit the access log—which was the subject of continued, initially unsuccessful efforts to produce as directed by the Master—into the record in an Application for Relief filed on November 18, well after the conclusion of the Master's proceedings, and the same day the Special Master filed her Report. The County opposed that application the same day, asserting, most intelligibly, a claim that the access log somehow violated someone's Fifth Amendment rights. The Special Master granted the application. We find no merit to the County's Fifth Amendment argument regarding the log, which it did not raise at any of the several times during the evidentiary hearings when the Secretary asked the Master to direct the County to produce the log. Therefore, we adopt the Special Master's order admitting the exhibit.

briefing and argument concerning whether this Court has jurisdiction to entertain the instant interlocutory appeal under Pa.R.A.P. 311(a)(4) . . . and/or Pa.R.A.P. 313."[63] On the same day, this Court's Prothonotary sent correspondence to the attorneys of record indicating that the Secretary's supplemental brief would be due thirty days after the date of the Order, and that Fulton County's supplemental brief would be due thirty days after service of the Secretary's brief.[64]

In the wake of our May 17, 2022 Order, Fulton County's (and its attorneys') pattern of neglect and non-compliance emerged. The Secretary timely filed and served a supplemental brief concerning this Court's appellate jurisdiction on June 16, 2022, which established July 18, 2022 as the due date for Fulton County's responsive brief.[65] On June 28, 2022, while the appeal was pending, and while Fulton County to all reasonable appearances was precluded from permitting a third-party inspection of the County's voting

---

[63] Rule 311(a)(4) allows an interlocutory appeal as of right of an order denying an injunction, and Rule 313 allows an interlocutory appeal as of right of a collateral order. A collateral order is one that is "separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost." *Rae v. Pa. Funeral Dirs. Ass'n*, 977 A.2d 1121, 1125 (Pa. 2009) (quoting Pa.R.A.P. 313). Although this Court previously noted probable jurisdiction, we nonetheless recognized (a) that the appeal implicated a nascent question of the nature of the relief that the Secretary sought (*i.e.*, injunctive versus discovery-related), and (b) that the distinction might determine our appellate jurisdiction. We have never decided the jurisdictional question. As explained at length below we impose a sanction that moots the underlying appeal and with it the jurisdictional question.

[64] As of that date, the attorneys who had been removed during the April 12 Commission meeting had not withdrawn their appearances in this Court. Attorney Carroll, who had been appointed special counsel on April 12, also had yet to enter his appearance.

[65] The thirtieth day after service fell on a Saturday, extending the County's deadline to the following Monday.

equipment, Attorney Carroll entered his appearance in the underlying litigation in the Commonwealth Court. Attorney Carroll did not move for the admission *pro hac vice* of Attorney Lambert, who had been appointed with him.

The Commonwealth Court having denied the Secretary's preliminary objection to Count III of the Petition for Review on May 23, 2022, the Secretary had filed her Answer and New Matter to Fulton County's Petition for Review on June 22, 2022. Consequently, by rule, Fulton County's responsive pleading in the Commonwealth Court was due on or before July 12. Despite the fact that Attorney Carroll entered his appearance on June 28, 2022, he waited until 5:27 p.m. on the date of the July 12 deadline to file a motion seeking to extend the time for a response until July 18. Therein, Attorney Carroll noted his June 28 entry of appearance and cited his status as "a solo practitioner . . . newly undertaking representation of Petitioners."[66] He did not mention that he had been appointed co-special counsel for the County in a public meeting over three months earlier. He also offered no explanation for failing to seek an extension earlier in the two weeks between his entry of appearance and the deadline for Fulton County's responsive pleading. The Commonwealth Court granted the motion, later extending the deadline until July 26, 2022.

On July 5, 2022, this Court's Prothonotary sent correspondence to the most recent counsel of record for Fulton County, James M. Stein, James M. Stein, Jr., and Douglas Joseph Steinhardt, advising them that oral argument had been scheduled for September 14, 2022, in Philadelphia. The standard notice directed counsel to return an acknowledgment of receipt and advised that the return would confirm that the responding

---

[66] Motion to Extend Time to File Responsive Pleading, 7/12/2022, at 1.

attorney or substitute counsel would appear as specified. It added that requests for continuances "are disfavored," "must be brought at the earliest opportunity," shall be verified, and shall "set forth in detail the unforeseen circumstances necessitating a continuance."[67] The Secretary promptly returned an acknowledgment. Fulton County did not.

On July 20, 2022, our Prothonotary sent another letter to Attorneys Stein[68] and Steinhardt. The letter referred to our May 17, 2022 order scheduling argument and directing submission of a supplemental brief, and it noted that Fulton County's jurisdictional brief was overdue. The letter directed the County to "file for an extension of time *Nunc Pro Tunc* together with [its] brief on or before July 25, 2022."

On July 25, this Court sent additional notices to Attorneys Stein and Steinhardt, again soliciting their acknowledgment of the argument notice. This was followed on July 26 by still more correspondence "remind[ing]" counsel of their obligation to respond to this

---

[67] Notice of Date and Time of Argument, 7/5/2022.

[68] We continued to transmit communications to Attorneys James M. Stein and Douglas Steinhardt because, as reflected in the public dockets and corroborated by our consultation of the relevant public filings, Attorneys Stein and Steinhart continued to be listed as counsel for the County in this case. Attorney Stein remains co-counsel of record as of this writing, both in this Court and in the Commonwealth Court in the underlying litigation. Attorney Steinhardt remained counsel of record through the summer, finally withdrawing his appearance before this Court on October 26, 2022, about a week after the Secretary filed the Sanctions Application. Even if any of these attorneys *had* withdrawn before a summer's worth of non-responsiveness to this Court's notices, it was incumbent upon them to forward our communications to the County or to Attorney Carroll. As well, Attorney Carroll had a professional obligation to confer with the County's former counsel promptly upon his retention to whatever extent was necessary to ensure his competent representation of the County. The consequences of any failures in this regard are attributable to both Fulton County and Attorney Carroll.

Court's Orders and notices and directing counsel's attention to the aforesaid July 5 and July 25 notices.

At 7:10 p.m. on July 26, 2022, Attorney Carroll belatedly entered his appearance in this Court. At 7:51 p.m. on that date, he filed a "Motion *Nunc Pro Tunc* for Leave to File Appellees' Supplemental Brief." Not only was this motion filed after the July 25 deadline we prescribed, but it also did not include the supplemental brief that this Court directed the County to include with the motion. By way of an explanation for Fulton County's continuing noncompliance, Attorney Carroll offered only this: "Undersigned counsel, having just appeared in this case, for good cause, hereby moves the Court to allow for an extension of the filing of [the County's] supplemental brief to Monday, August 8, 2022." August 8 was fourteen days after our already-extended deadline for the filing. Attorney Carroll offered nothing to substantiate "good cause" and did not qualify his "just having appeared" comment with an acknowledgment of his April 12 appointment as special counsel specifically for this litigation—or, for that matter, his appearance and active participation in the underlying litigation in the Commonwealth Court approximately a month before entering his appearance in this Court.

On July 27, 2022, this Court sent another argument notice and request for acknowledgment, this time directly to Attorney Carroll. On July 29, we entered an Order granting Attorney Carroll's request for an extension until August 8, 2022, to file the County's supplemental brief. But August 8 came and went. This Court received no supplemental brief; the County *never* filed one. On August 10, 2022, this Court's Prothonotary sent yet another letter to Attorney Carroll. The letter noted that the Court *still* had not received an acknowledgment of the argument notice. The letter also informed

Attorney Carroll that, because he had failed to file a jurisdictional brief, even after the additional two-week extension that this Court had granted, Fulton County would not be permitted to present oral argument on jurisdiction. Finally, on August 11, Attorney Carroll returned his acknowledgment of the oral argument notice.

Oral argument was scheduled for Wednesday September 14, 2022. On the morning of Monday, September 12, 2022, Attorney Carroll a "Motion to Adjourn Oral Argument," asserting emergent personal reasons that allegedly prevented him from "prepar[ing] for oral argument . . . and/or associat[ing] other counsel as a substitute this close to the time for the presentation of oral argument."[69] Attorney Carroll's Motion to Adjourn Oral Argument was not verified, as this Court's argument notice expressly requires of those seeking a continuance. Attorney Carroll averred that the Secretary did not accede to the request, preferring that this Court decide the collateral appeal on the parties' briefs. Failing that, the Secretary asked that argument be rescheduled for this Court's November session in Harrisburg. This Court granted the extension in a September 13 Order and directed that the case be heard in Philadelphia during our October session. We noted: "Counsel **SHALL** appear for that scheduled argument, and

---

[69] Attorney Carroll had not yet informed this Court that Attorney Lambert was his co-counsel, nor had he sought her admission *pro hac vice* below or in this Court. Although the rules governing *pro hac vice* representation direct that the sponsoring attorney must be in attendance at all court proceedings in connection with the representation, that requirement is qualified by a carve-out when sponsoring counsel is "excused by court." *See* Pa.R.Civ.P. 1012.1(d)(1). This is not to say that we would have granted such a request. But, had Attorney Lambert been admitted *pro hac vice*, it would have given Attorney Carroll a good-faith alternative to filing a disfavored, last-minute request for a continuance reflecting no contingency planning.

no further continuance requests will be entertained."[70]  Our Prothonotary scheduled argument for October 26, 2022.

### II.    The Speckin Forensics Inspection of the Voting Equipment and the Secretary's Application for Contempt and Sanctions

Shortly before the rescheduled argument, the Secretary redirected our focus to a pressing matter.  On October 18, 2022, the Secretary filed the Sanctions Application before us.  The Secretary informed this Court that, on July 13 and 14, 2022, Fulton County allowed Speckin to inspect the voting equipment at issue in this litigation, in alleged defiance of our pending stay order.

Neither the Commissioners' intent, nor the fact, nature, and scope of this inspection, were addressed in a public proceeding by the Fulton County Commission or Election Board, nor was the inspection approved by a formal vote of either body.  The County also did not notify the Secretary or Dominion, both of whom previously had claimed the right to notice of any inspection—the Secretary, as a function of her authority over the administration of elections and Dominion, based upon the terms of its contract with Fulton County.  Even Commissioner Shives did not learn until September 2022 that the July inspection was planned or had occurred.

So closely held was the news of the planned inspection that it only came to public light (indirectly) when Fulton County filed a separate breach of contract action against Dominion in the Court of Common Pleas of Fulton County on September 21, 2022, just seven days after the September 14, 2022 oral argument that Attorney Carroll averred he

---

[70]    Emphasis in original.

could not attend.[71] Fulton County's complaint relied principally upon Speckin's September 15, 2022 report of its findings from the inspection, which the County attached. The County explained that the Speckin report was based upon analyses "performed on six hard drives in Fulton County" in July of 2022.[72] Speckin described a highly intrusive examination of the County's voting equipment, which the County does not dispute.

Two events followed the filing of the Secretary's Sanctions Application. First, this Court entered an order appointing Commonwealth Court President Judge Cohn Jubelirer as Special Master to conduct the evidentiary proceedings necessary to develop a record sufficient to address the Secretary's allegations and the relief the Secretary sought. We directed the Master to provide a report proposing findings of fact and conclusions of law on or before November 18, 2022. In that October 21, 2022 Order, this Court directed the Special Master (1) to determine whether the Secretary's application sounded in civil or criminal contempt; (2) to "afford the parties such process as is due in connection with that determination"; and (3) to make separate determinations as to each form of relief the Secretary seeks, including the imposition of sanctions, the award of counsel fees, and

---

[71] Dominion removed the contract action to the United States District Court for the Middle District of Pennsylvania, where it remains as of this writing. Separately, on September 1, 2022, Fulton County appealed, also to the Fulton County Court of Common Pleas, an August 2, 2022 ruling of the Pennsylvania Office of Open Records ("OOR") that granted Dominion relief from Fulton County's categorical denial of certain requests under Pennsylvania's Right-to-Know Law ("RTKL"), 65 P.S. §§ 67.101, *et seq*. Notably, the OOR decision identified Carroll as attorney of record. Evidently he actively undertook that matter, like the underlying litigation, well before he entered his appearance in this Court.

[72] Sanctions App., Ex. A, Complaint at 17 ¶67. It is undisputed that the specific equipment Speckin inspected is the same equipment to which this Court's stay order applied.

dismissal of Fulton County's underlying and ongoing challenge to the Secretary's authority to decertify Fulton County's voting machines.

In a second Order issued the same day, this Court directed that this Court would not hear oral argument on the pending appeal of the Commonwealth Court's denial of a protective order as scheduled. Instead, we would rule on the appeal based upon the parties' briefs.

### III. The Special Master Proceedings

### A. Discovery

On October 24, 2022, the Special Master issued an initial order (1) directing Fulton County to file an Answer to the Secretary's Sanctions Application, (2) directing the parties to file memoranda of law concerning the sanctions sought by the Secretary, and (3) scheduling a status conference for October 27.[73] At the October 27 conference, the Special Master and the parties agreed as a threshold matter that the Secretary's assertion of contempt was civil in nature. This resolved the first issue that this Court directed the Special Master to address, and it is a determination that the parties did not object to then or now.[74]

_____

[73] As a technical matter, inasmuch as the Special Master acts on this Court's behalf, all filings are in a sense to this Court. Nonetheless, the Special Master's Orders and the parties' filings directed to the Special Master's consideration have been docketed with the underlying litigation at 277 MD 2021, while filings soliciting the Justices' direct attention have been filed at this Court's appellate docket at 3 MAP 2022, J-46-2022. Accordingly, a full grasp of these proceedings is best gained through consultation of both records.

[74] Attorney Carroll agreed that the Secretary's allegations implicate civil rather than criminal contempt. *See* Status Conference Transcript, 10/27/2022, at 3-4 (Special Master: "There is agreement that to the extent [she] would recommend any relief, it would not be in the nature of criminal sanctions[?]" Attorney Wiygul for the Secretary: "[W]e agree that this would be a civil contempt proceeding." Attorney Carroll: "I would agree with that."). Attorney Carroll nonetheless presented this as an open question in later (continued…)

The Secretary proposed "targeted" discovery including depositions of County Commissioners Ulsh, Bunch, and Shives, and the disclosure of communications and documents in which the parties discussed the Speckin inspection and this Court's protective order. The Secretary explained that it sought these items so that it could determine who instigated and decided to conduct the inspection, who engaged and paid Speckin, and assess the relevant individuals' understandings of and intentions regarding our order.

The County opposed the Secretary's proposal categorically. Attorney Carroll maintained that no discovery could occur until the Special Master ruled upon the scope of this Court's protective order, because Fulton County contended that its conduct fell entirely outside our protective order's scope, rendering Speckin's inspection permissible.[75] Consequently, the County asserted, contempt would not lie as a matter of law. Fulton County also maintained that *any* discovery would impair its litigation interests in the County's pending breach of contract action against Dominion as well as its RTKL appeal.

---

filings. *See* Fulton County's Emergency Application for a Preliminary Injunction to Enjoin Discovery in Special Master Proceedings and to Compel Legal Rulings Preceding Said Discovery, 11/1/2022, at 18 (insisting that the "nature of the contempt sought by the Secretary must be decided" before discovery could proceed); *compare* Fulton County's Emergency Application for a Preliminary Injunction to Enjoin Depositions Scheduled for November 7, 2022 and to Have Special Master Rule on Fulton County's Legal Issues Raised in Its Motion Objecting to Discovery, 11/7/2022, at 6 (noting that the Special Master had "concluded" that the Secretary sought civil contempt), *with id*. at 24 (indicating that among the "predicate legal issues" yet to be decided is "whether the contempt proceedings are 'civil' or 'criminal' in nature").

[75]   *See generally* Answer to Appellant's Application for an Order Holding Appellees in Contempt and Imposing Sanctions, 10/26/2022 (docketed in the Commonwealth Court at 277 MD 2021).

The Special Master rejected Fulton County's arguments and ruled that discovery would proceed. In her October 27, 2022 Order, the Special Master directed the parties to provide a joint scheduling order suggesting deadlines for discovery—or, if no agreement could be reached, separate proposed orders—by noon on October 28, 2022. The Special Master added that no continuance would be granted and no late submission would be considered.

The parties failed to reach an agreement. After receiving the parties' proposals, the Special Master issued an order on October 28, 2022, which functioned both as a rule to show cause under Pa.R.Civ.P. 206.7 why the Secretary's Sanction Application should not be granted and as a detailed discovery and scheduling order for the proceedings. The Master noted that, while the Secretary submitted a proposed schedule, the County instead dedicated its submission to arguing (again) that it could not engage in discovery absent the aforesaid "predicate legal ruling" concerning this Court's stay, and the County further stated "global objections" to discovery based upon the sweeping application of various alleged privileges.[76] The Special Master declined to grant relief on either theory, but, in issuing the rule, invited Fulton County to assert any defenses to the contempt allegations.

The balance of the order directed the parties to serve written discovery requests by noon on October 31, and to respond, produce, *or object* no later than noon on November 2. The order further specified that all privilege-based objections must be accompanied by a detailed privilege log and cautioned that any untimely objections would be waived and disregarded. Accommodating Attorney Carroll's scheduled vacation the

---

[76] *See* SMR at 20.

week beginning on October 30, and without objection by the parties, the Special Master scheduled the evidentiary hearing for November 9 and 10.

Importantly, the Special Master admonished the parties as follows: "Given the existing time constraints in this matter, no extensions or continuances shall be granted and no late submissions will be considered by the Court. In the event counsel for any party cannot meet the deadlines set forth above, the Court expects the parties to retain other counsel."[77]

As the hearings approached, the County repeatedly confounded the Special Master's efforts to conduct these proceedings in an orderly and efficient manner with serial interruptions, delays, and even what can only be described as defiance. The Secretary timely served discovery requests on October 31. But at approximately 10:30 p.m. on November 1—four days after the Master issued her rule and scheduling order, and approximately four business hours before responses and objections were due— Fulton County filed directly to this Court (rather than the Special Master) an "Emergency Application for a Preliminary Injunction to Enjoin Discovery in Special Master Proceedings and to Compel Legal Rulings Preceding Said Discovery" ("First Application to Enjoin"). Therein, Fulton County contended that there was no genuine dispute of a material fact requiring discovery because the County conceded that the Speckin inspection had occurred. This argument wholly disregarded the fact that the Secretary's contempt allegations and other stated bases for the imposition of sanctions entail state-of-mind determinations that are not informed by concessions of the occurrence or non-occurrence

---

[77] Order, 10/28/2022, at 4.

of events alone. The County has never really acknowledged, much less offered a discernible defense regarding, these critical state-of-mind factors.

Second, Fulton County argued at great length that discovery before resolution of the much-belabored "predicate legal rulings" would prejudice the County by forcing it to disclose information that might not serve its interests in the parallel breach of contract and RTKL actions against Dominion. Relatedly, the County vaguely invoked various RTKL protections without explaining what principle or authority dictated that RTKL protections may serve as a discovery bar in substantially unrelated litigation.[78] Finally, Fulton County argued—again, vaguely—that disclosures which conformed to the Secretary's request would "violate the individual constitutional rights of the proposed deponents and other potential witnesses."[79]

Conspicuous by its absence from the First Application to Enjoin was any developed argument as to why these various objections could not have been raised individually to the Secretary's detailed proposed deposition questions, interrogatories, and requests for admission and production as directed by the Special Master. This omission has persisted throughout these proceedings. The County does not maintain that the time afforded was insufficient. The County does not argue that the Secretary's requests contradicted the Special Master's order, which bore the hallmarks and expectations of traditional discovery practice but for the compressed schedule. Reading the County's First Application to

---

[78]   The only overlap of which we are aware lies in the fact that certain RTKL privileges are materially the same as privileges generally enjoyed in litigation. This is not a consequence of any connection, but is rather a coincidence of certain protections that are applied more or less universally for their own sakes such as the limited attorney-client and work-product privileges.

[79]   First Application to Enjoin at 44.

Enjoin in isolation, one might think that the County was afforded *no* opportunity to protect its interests. In fact, it was denied none of the protections enjoyed by any litigant subject to discovery. But rather than crafting privilege-based objections to specific requests and questions and providing a privilege log as directed by the Special Master, the County wagered its limited time on a long-winded *cri de coeur* insisting that this Court excuse it from the fact-finding process that this Court itself had prescribed.

We denied relief in a November 2, 2022 Order, referring the question to the Special Master. We underscored that our order had no prejudicial effect on "Petitioner-Appellee's rights to seek discovery-related relief before the Special Master *in due course and in full conformity with any prior or future orders or directives issued by the Special Master.*"[80] The County's last-minute application and our consideration of same inevitably had scuppered the Special Master's carefully crafted schedule. But rather than hold Fulton County to the losing side of its own gamble, we extended the deadlines for responses and objections by twenty-four hours—an extension to which the Special Master added eight hours of grace time in a subsequent order. Still, the County again declined its renewed opportunity to engage in good-faith discovery.

On November 3, 2022, the Secretary filed an "Emergency Application to Compel the Depositions of Ulsh, Bunch, and Shives on November 4 and 5, 2022." The Secretary asserted that, on October 31, it served upon Attorney Carroll proposed deposition questions and notices of remote video depositions for Ulsh, Bunch, and Shives for specific times on November 4 and 5, 2022. The Secretary maintained that its application was necessary because the County had engaged in a pattern of obstruction that invited

---

80      Emphasis added.

skepticism about its intent to comply. On November 4, in an "Application for Discovery Sanctions and Incorporated Memorandum of Law," the Secretary informed the Master that, although the County had served responses and objections to the Secretary's timely served discovery requests, the responses comprised an eleven-page standard objection asserting the now-familiar generic privileges and objections followed by responses to virtually all specific requests with another form response that asserted that the requests— all of them, apparently—were "absurdly onerous," overbroad, and burdensome, without explaining why.[81] In so many words, the County simply repeated—despite this Court's and the Special Master's repeated refusal to credit the claim—that no discovery at all was relevant to sanctions because it conceded that the Speckin inspection had occurred.

Rather than compel the depositions, the Special Master deferred ruling and *again* extended the deadline for the County to respond and/or object to the proposed deposition questions until 8:00 p.m. on November 3. The Master also scheduled a status conference for November 4. Again the Master rejected the County's contention that it was entitled to a threshold ruling on the scope of this Court's stay order before discovery could proceed. On November 4, before the time appointed for the status conference, the Secretary filed a new "Application for Discovery Sanctions" asserting the same unrectified deficiencies in the County's responses. The Secretary proposed that the court deem admitted any unresponded-to requests for admission and grant the Secretary certain findings of fact.[82]

---

[81] App. for Discovery Sanctions, 11/4/2022, at 10 (quoting the County's Response to Requests for Production at 9).

[82] *See* Pa.R.Civ.P. 4014 (providing that a request for admission is admitted unless the respondent "serves upon the party requesting the admission an answer verified by the party or an objection, signed by the party or by the party's attorney," and that, "[i]f the court determines that an answer does not comply with the requirements of this rule, it (continued…)

Meanwhile, the County filed its pre-conference "Motion for Predicate Legal Rulings and to Exclude Certain Discovery Requested by the Secretary," the title signaling its redundant substance. Undeterred by the Special Master's three prior rejections of the argument as well as this Court's refusal to consider the matter, the County *again* insisted that discovery could not proceed until the Master determined the scope of the stay order. And in case the Master again was unpersuaded, the County asked the Master to allow discovery subject to her "categorical determination as to Fulton County's rights given that there remains underlying litigation, additional litigation by and between Fulton County and Dominion, and Fulton County's general rights and privileges under law, including the RTKL." This "alternative" simply dressed the same old argument in slightly different garb. Here again the County insisted upon a "predicate" ruling.[83]

The November 4 status conference proceeded as scheduled. Again, the Master denied the County's redundant objections for familiar reasons. Reminding the County that a party objecting to discovery bears the burden of establishing non-discoverability,[84]

---

may order . . . that the matter is admitted"); Pa.R.Civ.P. 4006 (same with respect to written interrogatories); *see also* Special Master's Order, 11/3/2022, at 3 ¶4 (citing prior orders and reiterating that "[f]ailure to timely return objections to discovery requests to the other parties will result in waiver of any such objections, and no untimely discovery-related motions will be considered"); Pa.R.Civ.P. 4019(a)(2) ("Sanctions") (specifying that a party who fails to provide sufficient answers or objections to discovery "may not be excused on the ground that the discovery sought is objectionable unless the party failing to act has filed an appropriate objection or has applied for a protective order").

[83] Attorney Carroll's temerity was on full display during the conference that immediately followed, when he asked (again) "for a motion for a stepped approach," in which discovery would occur only after the predicate rulings upon which he insisted, and then declared that the County "*deserve[d]* legal rulings before we agree to this." N.T., 11/4/2022, at 10-11 (emphasis added).

[84] *See, e.g., Fisher v. Erie Ins. Exch.*, 258 A.3d 451, 461 (Pa. Super. 2021) ("The party invoking a privilege must initially set forth facts showing that the privilege has been (continued…)

the Special Master rejected the County's objections for want of particularity as well as the County's dubious invocation of unspecified "rights" associated with the effect of discovery in this proceeding upon its pending contract suit and RTKL appeal against Dominion.[85] The Master directed that the depositions for Ulsh, Bunch, and Shives be rescheduled for November 7 or 8, 2022. The Master also declined to rule on the Secretary's pending application(s) for discovery sanctions until after the evidentiary hearing.

At the November 4 conference, Attorney Carroll asserted for the first time that Commissioner Ulsh would be unable to attend the evidentiary hearing on November 9 and 10 because he had a previously scheduled (and previously undisclosed) vacation requiring him to depart on Election Day, November 8, 2022, immediately after the election ended.[86] During the hearing, the Master reminded Attorney Carroll that the hearing was scheduled to accommodate *his* scheduled vacation per the October 27 hearing, and in

---

properly invoked." (cleaned up)). For the same proposition, the Special Master cited *Red Vision Systems, Inc. v. Nat. Real Estate Info. Servs., L.P.*, 108 A.3d 54, 62 (Pa. Super. 2015).

[85] We stated the operative principle in a case involving the clergy privilege, and that principle is equally applicable to any invocation of an evidentiary privilege or other basis for withholding evidence:

> Exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth. Thus, courts should accept testimonial privileges only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth.

*Commonwealth v. Stewart*, 690 A.2d 195, 197 (Pa. 1997) (cleaned up). This principle will not countenance, and does not allow, the County's steadfast refusal to cooperate with discovery requests and its persistent invocation of inapplicable privileges.

[86] *See* N.T., 11/4/2022, at 26-27.

the order that followed, the Master "caution[ed] that [the Master] expects all Commissioners to comply with properly served notices to attend."[87]

The Secretary again served Attorney Carroll with the deposition notices, but the effort proved futile. At 7:54 a.m. on November 7, shortly before the first scheduled deposition at 9:30 a.m., Fulton County filed directly to the Justices of this Court a sixty-page "Emergency Application for a Preliminary Injunction to Enjoin Depositions Scheduled for November 7, 2022 and to Have Special Master Rule on Fulton County's Legal Issues Raised in Its Motion Objecting to Discovery." With one modest exception, the Application was materially indistinguishable[88] from its November 1 request to this Court to block discovery.

The lone new contention appeared only in the first paragraph of the Introduction, where the County *now* asserted that no Commissioners could appear for their depositions that day because the preceding Friday (November 4) the Secretary "ha[d] notified counties that there ha[d] been a system-wide outage and additional failures in their election management, and in the equipment systems databases that the Secretary uses for elections to occur smoothly"—specifically, the Statewide Uniform Registry of Electors

---

[87] Special Master Order, 11/4/2022, at 5 n.3. As noted, ever since October 24, 2022, the evidentiary hearing had been scheduled (without objection) for November 9 and 10, and was extended a week past the Special Master's initial preference in order specifically to accommodate Attorney Carroll's own scheduled vacation.

[88] While we decline to compare the applications word by word, the two filings' tables of contents are word-for-word identical but for the deletion from the latter application of the former application's argument section 2.a.

("SURE") system, which among other things enables counties to generate poll books to be used during the election.[89]

The Secretary appended to its response to the County's Application a declaration under penalties for unsworn falsifications[90] by Jonathan Marks, the Deputy Secretary for Elections and Commissions at the Department of State. Deputy Secretary Marks averred that the outage occurred at 1:00 p.m. on Friday, November 4, but that it did not affect the County's ability "to record returned ballots and process applications."[91] He acknowledged that the outage impeded the County's "ability to generate certain reports and poll books," but asserted that all issues were resolved by 7:20 a.m. on Saturday, November 5.[92] He also noted that, "[a]fter initial communications as to when the outage would be resolved, *Fulton County printed its poll books on November 5*," and the Department received no further communications from the County.[93] Thus, the problem that Attorney Carroll cited to support extraordinary relief he had previously sought by other means fully was resolved well within twenty-four hours of its occurrence—and County elections officials had utilized

---

[89] County's Emergency Application for a Preliminary Injunction, 11/7/2022, at 4; *see id*., Ex. F. The November 4 correspondence from the Secretary described an outage "impacting various services of" the SURE system. It did not direct any action by County Boards of Election, and Attorney Carroll made no representations as to whether the problem had been solved during the intervening weekend, leaving the impression that the problem persisted into the day he raised it as a basis not to attend depositions.

[90] *See* 18 Pa.C.S. § 4904

[91] Answer in Opposition to County's Emergency Application, Ex. F at 2 ¶5.

[92] *Id*.

[93] *Id*., Ex. F at 2 ¶6 (emphasis added).

the briefly disabled functionality two days before Attorney Carroll filed a document citing the issue to relieve his clients of their obligations to appear.

Later the same day—but after the time the first deposition was scheduled to begin—this Court denied the County's Application *per curiam* without comment.

At 8:05 a.m., ten minutes after filing the aforesaid Application with this Court, Attorney Carroll informed counsel for the Secretary that his clients would not appear for the noticed depositions *or* for the evidentiary hearing scheduled for November 9. The Secretary immediately requested that the Master hold Fulton County in contempt and direct the arrest of Commissioners Ulsh and Bunch to ensure their appearances at the November 9 hearing. The Special Master again held the Secretary's request for sanctions in abeyance but made clear that all parties who had been noticed must appear.

Attorney Carroll remained undeterred. He responded by filing a "Motion and/or Reply to Secretary's Motion and to Suspend Proceedings Against County Commissioners During Election Under Pennsylvania Law and to Stay Pending Application for Injunction in the Supreme Court."[94] Attorney Carroll now contended that the Commissioners could not appear at the November 9 hearing because such appearance would impede them from executing their official duties as members of the Election Board the day after the election.

This position was nothing short of astounding. First, of course, Attorney Carroll already had agreed to the November 9 hearing, scheduled then for his benefit, and presumably when he was well aware that the election fell on November 8 and was more

---

[94] The allusion to an application for injunction evidently referred to Attorney Carroll's intention to seek such relief from the United States Supreme Court. He never filed such an application.

or less aware of the Commissioners' obligations as members of the Board of Elections. Second, he had informed the Court on November 4 that Commissioner Ulsh could not attend the November 9 hearing because he had scheduled a vacation that would begin *on Election Day* immediately after the election was completed. In effect, Attorney Carroll maintained that the November 9 hearing would interfere with duties *on* November 9, but Commissioner Ulsh could discharge those same duties both on Election Day itself and on the day of the hearing from his vacation. Finally, in between these brackets, Attorney Carroll sought to relieve the Commissioners from their obligations to appear for their depositions, citing a problem that *no longer existed*.

The Special Master denied relief on November 8 and (again) directed all noticed parties to appear for the next day's hearing. But by then, it was too late to depose the witnesses. Attorney Carroll had achieved his clear objective to deny the Secretary the opportunity to depose his clients by any means, no matter how spurious.

### B. The Hearings and the Parties' Proposed Findings of Fact and Conclusions of Law

Around 1:00 a.m. on the morning of the November 9 hearing, Attorney Carroll for the first time filed a motion seeking *pro hac vice* admission of Attorney Lambert, who, like Attorney Carroll, had represented the County since April 12, 2022. The Special Master denied the motion, citing Attorney Carroll's failure to file it three days before Attorney Lambert's intended appearance as required by the Bar Admission Rules,[95] and because the motion lacked the mandatory payment certification from the IOLTA Board.[96]

---

[95]     *See* Pa.B.A.R. 301(b)(2)(ii).

[96]     Pa.R.Civ.P. 1012.1(b)(1).

While these deficiencies alone supported the Special Master's rejection of the motion, the Secretary identified additional problems that Attorneys Carroll and Lambert have never disputed or fully rectified. For example, Attorney Lambert failed to disclose the pendency of disciplinary proceedings in Michigan arising from litigation conduct in a Michigan federal case that also led to a sanctions order making her jointly and severally liable with co-counsel for over $170,000 in counsel fees in 2020 election-related litigation deemed frivolous and vexatious.[97] The court in that case also referred Attorney Lambert and co-counsel to the Michigan Attorney Grievance Commission and the disciplinary authority for any other jurisdictions where counsel was admitted "for investigation and possible suspension or disbarment and ordered [counsel] to complete at least twelve (12) hours of continuing legal education in the subjects of pleading standards . . . and election law."[98] Attorney Lambert eventually provided proof of good standing in the Michigan bar, but never denied the pending disciplinary complaint.[99] But neither she nor Attorney Carroll has ever acknowledged that Rule 1012.1 is not satisfied by proof of good standing, even when challenged on it before and by the Special Master.[100]

The Special Master nonetheless allowed Attorney Lambert to remain in the courtroom as the County's chosen counsel, explaining that, "although [Attorney Lambert]

---

[97] *See King v. Whitmer*, 2:20-cv-13134, 2021 WL 5711102 (E.D. Mich. Dec. 2, 2021).

[98] *Id*. at *1 n.1.

[99] Attorney Lambert noted that her appeal of the sanctions award is pending before the United States Court of Appeals for the Sixth Circuit. As of this writing, the last event in that appeal appears to have been oral argument, held on December 8, 2022.

[100] *See* Pa.R.Civ.P. 1012.1(c)(1)(ii) (requiring the applicant to disclose "any disciplinary proceedings" in any jurisdiction and to detail "the circumstances under which the disciplinary action has been brought").

wouldn't be able to question witnesses or speak to the court, [she] could assist Attorney Carroll, confer with him and assist him."[101]  Attorney Lambert never was, and never has been, admitted *pro hac vice* in this proceeding or the underlying litigation.[102]

The November 9 hearing comprised the testimony of Commissioners Ulsh and Shives.  The entirety of November 10 was spent on Mr. Macias' testimony as to the materially undisputed potentially spoliative effects of the third-party inspections of the County's voting equipment.  Commissioner Bunch ultimately testified remotely on November 14 after an asserted emergency rendered him unavailable to appear sooner.

The testimony of Commissioners Ulsh and Bunch need hardly be reviewed.  While Attorney Robert A. Wiygul for the Secretary methodically questioned both of them regarding every potentially relevant communication, decision, and event (official and unofficial) that pertained to their knowledge and understanding of our stay order and the Speckin inspection, each of these two commissioners invoked his Fifth Amendment right against self-incrimination, sometimes to the point of absurdity.[103]  The Special Master

---

[101]  N.T., 11/9/2022, at 28-29; *see* SMR at 38.  Later, the Secretary would challenge the degree of Attorney Lambert's participation in the proceedings, indicating on several occasions that Attorney Lambert was persistently and audibly dictating questions and arguments directly into Attorney Carroll's ear.  *See* SMR at 40 n.29 (citing N.T., 11/10/20223, at 22-23).

[102]  Between the first and second day of the hearing, Attorney Carroll filed an amended *pro hac vice* motion, which the Master once again found materially defective and which the Master denied.  Thus, Attorney Lambert continued in an advisory capacity on November 10.  No corrected motion was filed, and Attorney Lambert did not participate in the November 14 hearing.

[103]  For example, Commissioner Ulsh refused to answer a question concerning who represented him, N.T., 11/9/2022, at 141-43, and would not confirm whether he was aware of legal pleadings that had been issued in his name. *Id*. at 138 (refusing to respond to whether he had "a recollection of [he] and [his] Co-Petitioners fil[ing] this lawsuit against the Secretary in August of 2021").

repeatedly cautioned that, because these proceedings were civil in nature, the fact-finder could draw adverse inferences from these invocations.[104]

Of necessity, then, Commissioner Shives, who testified without invoking any privileges, provided much of the relevant probative evidence that Commissioners Ulsh and Bunch neither admitted nor denied. The resulting narrative revealed that her resistance to the measures undertaken by Commissioners Ulsh and Bunch in the name of investigating alleged irregularities in the 2020 general election resulted in her frequent exclusion from the discussions that led to, *e.g.*, the Speckin inspection, which she did not know about until months after it occurred. Much of what she *did* learn about the unofficial proceedings came from her incidental inclusion in group text conversations revealing the lengths to which her fellow Commissioners had gone to withhold information about actions undertaken, nominally on behalf of the County she had been elected to represent.

It also emerged that her failure to appear at her scheduled deposition was not a function of her deliberate non-compliance, as it evidently was for Commissioners Ulsh and Bunch, but rather because Attorney Carroll had failed to forward to her the notice of her deposition that the Secretary timely served upon him. Attorney Carroll waved away the omission as an oversight, but his oversight appears only to have affected Commissioner Shives, who, it turns out, had refused to support all or most of the efforts to interrogate the conduct of the 2020 election that led us to this pass and who was

---

[104] *See Harmon v. Mifflin Cty. Sch. Dist.*, 713 A.2d 620, 623 (Pa. 1998) (noting that an adverse inference may be drawn from the invocation of the Fifth Amendment by a witness in civil litigation, and stating that "the inference to be drawn from a party's failure to testify serves to corroborate the evidence produced by the opposing party").

unlikely to invoke the Fifth Amendment. Commissioners Ulsh and Bunch, conversely, evidently were informed of the notices.[105]

The Special Master's findings of fact necessarily derived from the testimony of Commissioner Shives and Mr. Macias. But the Master consistently appended to citations of those witnesses' testimony instances when Commissioners Ulsh and Bunch invoked the Fifth Amendment rather than address the same topic. This effectively embodied the Master's decision to draw adverse inferences as corroborative rather than direct evidence, as well-established law allows and the evidence in this case unequivocally justifies.[106] Notably, Commissioner Shives and Mr. Macias testified either to matters that the County has acknowledged at least by necessary implication (*e.g.*, the potentially

---

[105]     *See generally* N.T., 11/9/2022, at 217-29 (documenting an extensive, contentious colloquy reflecting suggestions of conflict, related unequal treatment of Commissioner Shives relative to Commissioners Ulsh and Bunch, and the degree to which Shives might be prejudiced as the lone Commissioner willing freely to testify at the hearing). When Attorneys Carroll and Lambert were selected by a majority vote of the Commission, Commissioner Shives had no choice but to accept the representation. But Attorney Carroll's failure to notify her of her mandatory obligation to attend a duly noticed deposition (and, for that matter, to attend the November 9, 2022 hearing, which she learned about the preceding evening), exposed her to sanctions and even arrest. *See id*. at 214-15 (regarding the lack of notice).

Relatedly, Attorney Carroll's continuing representation of all named Petitioners in these sanction proceedings, in which the Secretary has sought sanctions against the County, Petitioners Ulsh and Bunch individually, *and* Attorney Carroll, presents an obvious risk of a conflict between Attorney Carroll and his clients. Neither the parties nor Attorney Carroll have defended themselves at each other's expense, but that is not to say there were not defenses available to each that could prejudice another's interests. We will not take up this question *sua sponte*, but Attorney Carroll would be wise in future endeavors to address potential conflicts with his client in conformity with his ethical obligations.

[106]     *See Harmon*, 713 A.2d at 623-24.

spoliative effect of Speckin's inspection[107]) or that circumstances all but necessarily imply (*e.g.*, that Commissioners Ulsh and Bunch were conscious, at least generally, of our stay order and of the Secretary's stated basis for seeking it).

The parties and the Master agreed early in these proceedings that, after the hearings concluded, the parties would each submit proposed findings of fact and conclusions of law. Even though that agreement was confirmed on the record at the conclusion of the November 14 hearing—including as to the filing's form, *i.e.*, laid out with the customary numbered paragraphs with references to the record—the County declined to employ that format, or for that matter to submit *any* proposed findings of fact pertinent to the allegations of contempt. Instead, the County submitted a strikingly brief, minimally sourced document that rehashed its principal argument regarding the scope of this Court's protective order.[108] Conversely, the Secretary provided a nearly ninety-page narrative, painstakingly sourced, in the prescribed form.

---

[107] *Compare*, *e.g.*, Answer to Appellant's Application for An Order Holding Appellees in Contempt and Imposing Sanctions at 8 (noting that, per the Speckin report, "there was no way to determine whether and to what extent [the prior insertion into the voting equipment of external drives] compromised the data or the system during past elections); Dominion Complaint at 17 ¶69 (Sanctions Petition, Ex. A) (noting that the Speckin inspection showed that external USB hard drives had been inserted in the machines on several occasions, and that there is no known list of approved external drives that could have been or were used or inserted into the machines); *id*. at 2 ¶2 (Speckin concluding that there was no way to determine whether and to what extent these unauthorized drives compromised the data or the system) *with* Dominion Complaint, Ex. E (Speckin Report) (describing Speckin's imaging of voting machine hard drives to "Western Digital 4TB USB hard drives").

[108] An unresolved interlineation suggests that the County intended to engage Mr. Macias's testimony. *See* Fulton County's Proposed Findings of Fact and Conclusions of Law at 8 ("[MACIAS / CLEANING UP REMAINING HEARING TR REFS]"). In any event, while Mr. Macias's testimony is relevant to the undisputed risk of spoliation, it is Commissioner Shives' testimony that speaks to what Commissioners Ulsh and Bunch (continued…)

The County also argued that sanctions could not be imposed because, on its account, "[t]he Pennsylvania General Assembly has delegated *exclusive* authority to county election boards to perform several functions relating to purchasing, maintenance, inspection and investigation of voting equipment."[109] Because this obligation required the provision of "functional election equipment," the County continued, it "cannot be held in contempt for its good faith efforts to protect the constitutionally guaranteed rights of its citizens."[110] Closing with a *non sequitur* that neither the argument in which it appears nor the text of our stay order supports, the County contended that "[t]he Court's January [Stay] Orders did not prohibit Fulton County from conducting inspection [*sic*] of defunct and

knew and believed and when. The County makes no effort to propose a counternarrative on these points.

[109] *Id*. at 12 (citing, in the pages that followed, 25 P.S. §§ 2642-43) (emphasis added). In characterizing its authority as "exclusive," the County writes 25 P.S. § 2621 out of the Election Code. That section describes the Secretary's duty "[t]o examine and reexamine voting machines, and to approve or disapprove them for use in this state, in accordance with the provisions of this act." 25 P.S. § 2621(b). Notably, the architects of the Election Code believed that the powers and duties of both the Secretary and the county boards of elections merited their own entire articles of the Code. So to cite only the Code's provisions concerning county election boards is to disregard a suite of provisions pertaining to the Secretary—provisions which the County itself has discussed at length in the underlying litigation. In any event, no provision of the Election Code suggests that a county may unilaterally disregard a court order. Where a party believes an order conflicts with a statute, it may seek relief on that basis. But it may not decide for itself which of the competing mandates prevails. *Cf. Ford v. Kammerer*, 450 F.2d 279, 280 (3d Cir. 1971) (citing *Howat v. Kansas*, 258 U.S. 181, 189-90 (1922)) ("Whether or not the district court issued the preliminary injunction on the basis of a correct or incorrect view of the law, the order must unquestionably be obeyed.").

[110] Fulton County's Proposed Findings of Fact and Conclusions of Law at 12.

decertified voting machines that had already been decommissioned and were never going to be used again."[111]

The conclusory nature of the County's arguments can best be illustrated by the following excerpt from its submission:

> The issues in the underlying suit are purely concerning the legal question of who, among the Secretary and the County Board of Elections had authority to perform the acts of having the Dominion machines inspected in the first place.[112]  The actual integrity of the machines, and the extent to which they were inspected and/or compromised by the Wake TSI Report *is not* at issue in the underlying litigation.[113]  Therefore, in addition to not being within the scope of the Supreme Court's January Orders, and even if it was, the Conty [*sic*] had a right to do it, and even if it did not, the act in itself did ont [*sic*] violate the spirit of the January Orders, because no contemptuous act occurred by Fulton County have [*sic*] the defunct machines inspected.[114]

In sum, Fulton County has raised only one intelligible defense: the claim that our stay orders barred only the specified inspection at the specified date and time that was referred to in those orders.

---

[111]    *Id*. The County has repeatedly returned to its claim that the machines here at issue will never again be used due to their decertification and the County's acquisition of new voting equipment from one of Dominion's competitors.  Lost in this theory is that the County's Petition for Review *explicitly* seeks recertification of those machines and asserts bases for relief that clearly are predicated on disputed claims regarding the condition of the machines immediately after the Wake TSI inspection.  The County insists that it presents only questions of law, but how the County chooses to cast its Petition for Review is immaterial to the Secretary's right to defend against all claims as pleaded.

[112]    The County raises no such claim in the underlying litigation.  Rather, it challenges the Secretary's decertification authority, both facially and as exercised in this particular case.

[113]    As noted previously, the County's Petition facially contradicts this claim.  It also made the same claim to this Court in opposition to the Secretary's first Emergency Application.  When we granted the Secretary's application, the County might have suspected that this Court found its position at best less than clear.

[114]    Fulton County's Proposed Findings of Fact and Conclusions of Law at 18-19.

### IV. The Special Master's Recommendations and Our Analysis

#### A. Fulton County's Alleged Violation of this Court's Order and the Special Master's Recommendation That We Hold the County in Contempt

"There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt," which "has long been recognized as the appropriate means by which a court may compel compliance with its orders."[115] This inherent power dates back centuries, and it is embodied in our Judicial Code.[116]

Among the matters we directed the Special Master to determine was whether the Secretary's allegation of contempt and the sanctions sought were civil or criminal in nature. What distinguishes civil from criminal contempt are the ends to be achieved, and the classification dictates what process is due the alleged contemnor. This Court has explained the governing standard as follows: "it is a several[-]step process that must take place to hold one in civil contempt—rule to show cause why an attachment should not issue, . . . hearing on the contempt citation, [and an] adjudication of contempt."[117] In contemporary terms, the defendant in civil contempt must be given notice of its alleged contempt and the opportunity to respond. Here, Fulton County was given that much and more, much of it gratuitous and far more generous than the County's conduct deserved.

---

[115] *In re Investigating Grand Jury of Phila. Cty.*, 433 A.2d 5, 6 (Pa. 1981) (cleaned up).

[116] *See* 42 Pa.C.S. § 4132.

[117] *Commonwealth ex rel. Magaziner v. Magaziner*, 253 A.2d 263, 266 (Pa. 1969) (quoting *Commonwealth v. Snowden*, 1 Brewster 218, 219 (Pa. 1868)). Both *Magaziner* and *Snowden* addressed instances of imprisonment for civil contempt, but, plainly, the process required for coercive or compensatory relief should be no more exacting than it is to establish a basis for imprisonment.

With regard to the ends to be achieved, the distinction depends upon whether the sanctions' "dominant purpose is to punish for the violation of a court order [criminal contempt] or to coerce into compliance with the order [civil contempt]."[118] Civil contempt also enables the court to award the complainant expenses incurred as a consequence of the contemnor's violation.[119] In imposing sanctions for coercive purposes, "the court must exercise the least possible power to the end proposed."[120]

As noted above, notwithstanding Fulton County's occasional *post hoc* suggestion to the contrary, the Special Master and the parties agreed that this proceeding sounds in civil rather than criminal contempt. The Secretary primarily seeks compliance with this Court's temporary stay as well as compensation for the costs of obtaining and, belatedly, enforcing that stay when the County subverted that order in fact. We agree that the sanctions here at issue are to be resolved according to the rules of civil rather than criminal contempt.

"[I]n civil contempt proceedings the burden is on the complaining party to prove noncompliance by a preponderance of the evidence."[121] "The corollary of this proposition is that the order which is said to have been violated must be specific and definite."[122]

> Mere noncompliance with a court order is not by itself sufficient to prove contempt; rather, the complaining party must prove:

---

[118]  *Barrett v. Barrett*, 368 A.2d 616, 619 (Pa. 1977).

[119]  *See East Caln Twp. v. Carter*, 269 A.2d 703, 706 (Pa. 1970).

[120]  *Commonwealth, DEP v. Cromwell Twp., Huntingdon Cty.*, 32 A.3d 639, 657 (Pa. 2011).

[121]  *Barrett*, 368 A.2d at 621.

[122]  *In re Rubin*, 378 F.2d 104, 108 (3d Cir. 1967).

(1)  That the contemnor had notice of the specific order or decree which he is alleged to have disobeyed;

(2)  That the act constituting the contemnor's violation was volitional; and

(3)  That the contemnor acted with wrongful intent.[123]

The County lashes its defense entirely to the question of clarity; it argues that our stay orders pending appeal refer by their terms only to the then-emergent Envoy Sage inspection that those orders specified.  Consequently, it argues, nothing in our orders barred the County from inviting or facilitating another inspection by any different party at any different time—because the County did not violate an *unambiguous* mandate, we are told, the County cannot be held to have violated the order at all, and therefore cannot be held in contempt.

There is no shortage in Pennsylvania case law of boilerplate language to support this general proposition, but the County cites precious little of it.  Primarily, it relies upon *Stahl v. Redcay*.  There, consistent with the Third Circuit decision in *Rubin*, the Superior Court explained:

> Because the order forming the basis for civil contempt must be strictly construed, any ambiguities or omissions in the order must be construed in favor of the defendant.  In such cases, a contradictory order or an order whose specific terms have not been violated will not serve as the basis for a finding of contempt. . . .  A person may not be held in contempt of court for failing to obey an order that is too vague or that cannot be enforced.[124]

But the County offers nothing about *Stahl*'s context.

---

[123]  *Waggle v. Woodland Hills Ass'n, Inc.*, 213 A.3d 397, 403 (Pa. Cmwlth. 2019).

[124]  *Stahl v. Redcay*, 897 A.2d 478, 489 (Pa. Super. 2006) (quoting *In re Contempt of Cullen*, 849 A.2d 1207, 1210-11 (Pa. Super. 2004)); *see* Fulton County's Proposed Findings of Fact and Conclusions of Law at 8-9.

In *Stahl*, the Superior Court reversed sanctions imposed when counsel made a factual assertion during his opening argument that the court allegedly had precluded in a pre-trial ruling. But neither the opposing party nor the sanctioning trial court had cited *any* order imposing precisely the evidentiary constraint that the defendant allegedly violated, and the record disclosed none. The *Stahl* court nowhere suggested that violating the circumstantially clear intention of a court as embodied in a duly issued order of record is immunized simply by virtue of a claim of ambiguity that depends upon isolating the order from the circumstances of its issuance, including the stated reasoning of the party seeking the order and the logical intent of the Court in awarding it.[125]

Were the rigid proposition for which Fulton County cites *Stahl* consistent with the broader run of Pennsylvania law, that case's distinguishing features would be of little moment. But the law on this subject is not so doctrinaire. Like other jurisdictions we have surveyed, Pennsylvania law provides for far more sensitivity to circumstance than *Stahl*'s language suggests or its peculiar facts would require. Common sense dictates that a more rigid approach inevitably would tempt those prepared to play fast and loose with court orders.

We find particular guidance in *United States v. Christie Industries*,[126] which we cited favorably in our thoroughly sourced decision in *Commonwealth v. Garrison*.[127] In *Christie*, the United States Court of Appeals for the Third Circuit rejected a defense to

---

[125] Beyond *Stahl*—and by implication the cases cited therein, which the County does not discuss—the County cites only *Rodney v. Wise*, 500 A.2d 1187, 1190 (Pa. Super. 1985), a case that involved neither injunctive relief nor parsing a written order.

[126] 465 F.2d 1002 (3d Cir. 1972)

[127] 396 A.2d 971, 977 (Pa. 1978).

contempt that relied upon an excruciatingly literal reading of an order. The order in question was a preliminary injunction that barred the defendants "from preparing, packaging, promoting, selling, distributing, introducing and causing to be introduced and delivering and causing to be delivered for introduction into interstate commerce firecracker assembly-kits on the ground that they are banned hazardous substances within the meaning of the Child Protection Act of 1966."[128] In the order, the court described the assembly kits in question as containing "cylinder casings, cup-like end caps, fuse coil, one plastic bag containing potassium nitrate and one plastic bag containing aluminum powder and sulfur."[129] The government originally asked the court to enjoin shipping not only of "assembly-kits" but also of "any similar article, or any component of said firecracker assembly-kits."[130] But in its order granting the injunction, the court excluded the catch-all language.

Citing the necessity of clarity, the defendants raised several highly technical arguments that parsed the order so as to exclude the allegedly contemptuous conduct. The court rejected nearly all of these arguments, including in particular the claim that the order was not violated (a) by the shipment in a single package of components that made up the "kit," because the components were sold separately and were not advertised or sold as a "kit"; or (b) by substituting components such as non-cylindrical casings ("cylindrical" casings being the only sort described in the order); or (c) by shipping all components of an above-described kit but for the fuse coil.

---

[128]  *Christie Indus.*, 465 F.2d at 1005 n.2.

[129]  *Id*.

[130]  *Id*. at 1006.

The court rejected this last argument not because it was proscribed expressly or even implicitly, but because the court found that it violated the spirit and intent of the injunction to protect children during the pendency of litigation instantiated to do precisely that.[131]  The court observed that omitting the coil did not vitiate the essential non-compliance of the work-around, because a reasonably curious child could be expected to devise substitute fuses.

Similarly, the court found that the defendant violated the order when it added a warning in its catalog that only people of legal age should purchase the fireworks kits (or their equivalent) and that the buyer must sign a statement attesting that the buyer is of legal age.  Again engaging common sense rather than parsing syntax in a vacuum, the court observed that some children foreseeably would order the kits (or their equivalent) notwithstanding the warning and would have no scruple about signing the form dishonestly.[132]

The *Christie* court acknowledged "that a person will not be held in contempt of an order unless the order has given him fair warning that his acts were forbidden," and that "[t]he longstanding, salutary rule in contempt cases is that ambiguities and omissions in orders redound to the benefit of the person charged with contempt."[133]  But it added a critical caveat:

---

[131]     *See id*. at 1007 n.6.

[132]     *Id*. at 1007.  The court also cited circumstantial evidence that the defendant knew that its warning and signature requirement were ineffectual and that it intended to market to children, observing that the defendant had promised all purchasers an entry in a drawing for a radio-controlled model airplane.

[133]     *Id*. at 1006 (citing *Kammerer*, 450 F.2d at 280).

[T]his is not to say that where an injunction does give fair warning of the acts that it forbids, it can be avoided on merely technical grounds. *The language of an injunction must be read in the light of the circumstances surrounding its entry: the relief sought by the moving party, the evidence produced at the hearing on the injunction, and the mischief that the injunction seeks to prevent.*[134]

To similar effect is a long list of cases, including a Second Circuit case in which the court rejected a defense based upon a dubiously literal interpretation of an order: "In deciding whether an injunction has been violated it is proper to observe the objects for which the relief was granted and to find a breach of the decree in a violation of the spirit of the injunction, even though its strict letter may not have been disregarded."[135]

---

[134]   *Id*. at 1007 (emphasis added).

[135]   *John B. Stetson Co. v. Stephen L. Stetson Co.*, 128 F.2d 981, 983 (2d Cir. 1942) (citing, *inter alia*, *Ginsberg v. Kentucky Util. Co.*, 83 S.W.2d 497 (Ky. 1935), in which the court noted "a principle running through all authorities that injunction orders must be honestly and fairly obeyed and courts will not tolerate schemes or subterfuges, however artfully they may be clothed to disguise their real nature and purpose, if they are in fact designed to thwart the court's decrees; and the violation of the spirit of an injunction is a breach of the court's mandate even though its strict letter may not have been disregarded" (*id.* at 500)); *see United States v. Greyhound Corp.*, 508 F.2d 529 (7th Cir. 1974) ("To provide a defense to criminal contempt, the mistaken construction must be one which was adopted in good faith and which, *given the background and purpose of the order*, is plausible. The defendant may not avoid criminal contempt by twisted interpretations or tortured constructions of the provisions of the order." (emphasis added; internal quotation marks omitted)); *Institute of Cetacean Research v. Sea Shepard Conservation Soc.*, 774 F.3d 935 (9th Cir. 2014) (holding that an enjoined party may be held in contempt for providing a non-party with the means to violate the injunction if it knows the receiving non-party is likely to do so); *cf. Mayor of Vicksburg v. Henson*, 231 U.S. 259, 273 (1913) (rejecting a claim that a decree was *overbroad*, observing that "[t]he nature and extent of the . . . decree is not to be determined by seizing upon isolated parts of it or passages in the opinion considering the rights of the parties, but upon an examination of the issues made and intended to be submitted, *and what the decree was really designed to accomplish*" (emphasis added)); *Salazar v. Buono*, 559 U.S. 700, 762 (2010) (Breyer, J., dissenting) (citing *Stetson* and *Mayor of Vicksburg* for the proposition that "[c]ourts long have looked to the objects for which injunctive relief was granted, as well as the circumstances attending it, in deciding whether an enjoined party has complied with an injunction" (cleaned up)).

Writing for the Court in *McComb v. Jacksonville Paper Co.*,[136] Justice Douglas aptly anticipated the perils of literalist interpretations that exclude reasonable inferences about what any reasonable party would have understood was at issue in the run-up to the issuance of a contested injunctive order. In that case, Justice Douglas wrote:

> It does not lie in their mouths to say that they have an immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined. Such a rule would give tremendous impetus to the program of experimentation with disobedience of the law which we condemned in *Maggio v. Zeitz*[137]. The instant case is an excellent illustration of how it could operate to prevent accountability for persistent contumacy. Civil contempt is avoided today by showing that the specific plan adopted by respondents was not enjoined. Hence a new decree is entered enjoining that particular plan. Thereafter the defendants work out a plan that was not specifically enjoined. Immunity is once more obtained because the new plan was not specifically enjoined. And so a whole series of wrongs is perpetrated and a decree of enforcement goes for naught.[138]

---

[136]     336 U.S. 187 (1949).

[137]     333 U.S. 56 (1948). Although *Maggio* used the evocative "experimentation with disobedience" language, its discussion aimed at a somewhat different issue that nonetheless finds an echo in the County's conduct in this case. In that case, the Court cautioned that "a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy. . . . [W]hen [the order] has become final, disobedience cannot be justified by re-trying the issues as to whether the order should have issued in the first place." *Id*. Although this does not bear directly upon the County's argument regarding the proper scope of our order, it is relevant to the County's serial effort to recast various aspects of this case to suit its purposes during the course of this contempt proceeding. This captures, for example, the County's attempt to relitigate whether its Petition for Review in fact raises issues of fact, and its frankly incoherent claim that, because its voting equipment has been decertified and replaced, it is no longer voting equipment at all such that the County was as free to order its inspection as it would be to order the inspection of a county vehicle. This last, of course, is incoherent primarily because, if the County succeeds in its underlying legal challenge to the Secretary's authority to decertify its machines, then the decertification would be void. The County cannot seek to benefit from a decertification that it still hopes to invalidate in the underlying litigation.

[138]     *McComb*, 336 U.S. at 192-93.

The *McComb* Court also proposed an obvious good-faith alternative to gambling on a blinkered, self-serving reading of an order and hoping for the best: "Respondents could have petitioned the District Court for a modification, clarification or construction of the order. But [they] did not take that course . . . . They undertook to make their own determination of what the decree meant. They knew they acted at their peril."[139] The County might have elected some variation on this approach out of caution if it felt that the Speckin inspection could not wait.

In light of the circumstances in which the Secretary sought the protective order and the substance of the Petition for Review against which the Secretary sought to defend, and in the similar light cast by the relief the Secretary sought, the arguments the Secretary made in support in its several related applications here and below, and the arguments the County made in opposition, it would beggar credulity to accept Fulton County's suggestion that its agents were not aware that the Speckin inspection contravened the concern for spoliation that alone underlay this Court's decision to grant the Secretary the protective order it sought.

To similar effect, the Special Master observed:

Because the applications that elicited the Injunction Order clearly related to the collateral discovery issue on appeal, there was no need for any party to speculate or guess about the purpose of the Injunction Order . . . . The Supreme Court obviously intended to preserve its ability to render an appellate decision that was meaningful. . . . And **any** subsequent inspection of the Dominion Voting Equipment would moot out that appeal and prevent a meaningful resolution of the issues on appeal. Those issues were Dominion's right to protect its property and the Secretary's right to

---

139     *Id*. at 192 (emphasis omitted).

preserve evidence for her defense, which both depended entirely upon preventing further inspection of the Dominion Voting Equipment.[140]

Perhaps tellingly, the County does *not* openly test our credulity by proclaiming actual ignorance on the part of its agents. Although the County implies and surely would welcome that inference, it has never submitted evidence or clearly averred that any one of Fulton County's agents considered or was actually confused about the intended scope or objective of the temporary order that this Court issued. Instead, we have Commissioner Shives' testimony that the other two Commissioners understood the broader intention of our order; the serial invocations by Commissioners Ulsh and Bunch of the Fifth Amendment in response to any direct question about what they knew and believed; and the circumstantial evidence comprising how these two commissioners went about deciding to allow and ultimately facilitating the Speckin inspection, including walling off Commissioner Shives. They behaved to all appearances like people who knew that they had something to hide.[141]

---

[140]    SMR at 63 ¶8 (emphasis in original).

[141]    *See id*. at 67 ¶22 & n.38. The Special Master also noted (without expressly crediting) the Secretary's argument that, in addition to bespeaking Commissioners Ulsh and Bunch's desire to hide their activities from Commissioner Shives, the citizenry of Fulton County, the Secretary, and Dominion, the conspicuous secrecy with which the Commissioners acted also may have violated various statutes. These include 25 P.S. § 2643 (Election Code) ("All actions of a county board [of elections] shall be decided by a majority vote of all the members") and 65 Pa.C.S. §§ 705, 708 (the "Sunshine Act") (requiring public votes and providing that the public must be notified of any executive sessions held, and their reasons, in the public meeting immediately preceding or following the session). Like the Special Master, we find it unnecessary to address these issues. But we note that, when compared with the Commission's generally transparent behavior relative to their other efforts to inspect the voting equipment, it is suggestive that only the Speckin inspection was arranged so quietly, and that Commissioners Ulsh and Bunch turned secretive only after our stay order issued.

The Master also explained the patent absurdity of the County's reading: (1) that our first order, because it referred expressly to the Envoy Sage inspection and referred to the date and time for which it was scheduled, would have left the County free to reschedule the very same Envoy Sage inspection by a day or even an hour; (2) that our second order was issued, nonsensically, for the exclusive purpose of barring a particular inspection at a particular moment that passed nearly two weeks earlier; or, at best, (3) that we sought to stop only Envoy Sage from inspecting the machines, leaving literally any other individual or entity free to do anything to the voting equipment the County wanted.[142] The Special Master concluded:

> Put simply, . . . no reasonable interpretation of the Injunction Order would render it inapplicable to the Speckin Inspection. That inspection directly implicated the ground on which the Injunction Order was sought—avoiding spoliation[143] of the evidence. Equally telling, the interpretation the County now attempts to give the Injunction Order . . . is unsupported by any of the grounds offered to the Supreme Court in support of the Secretary's application for the injunction. Indeed, if anything, these grounds supported prohibition of the [Speckin] Inspection to an even greater degree than they supported prohibition of the Proposed Envoy Sage inspection.[144]

---

[142]    SMR at 63-65 ¶¶8-12.

[143]    During these hearings, Attorney Carroll in both his questioning and argument repeatedly made much of the proposition that Mr. Macias could not testify to a reasonable degree of certainty that the Speckin inspection *in fact* compromised the electronic information on the voting equipment as it was following Wake TSI inspection. But in so arguing, Attorney Carroll either misapprehended or sought to distract from the real issue—not the *fact* of spoliation but the impossibility of determining whether spoliation occurred. Not only did the County offer no countervailing evidence, it established through its own various pleadings and the findings in the Speckin report, itself, the inescapable uncertainty that followed the Speckin inspection.

[144]    *Id*. at 64-65 ¶12. Here, the Special Master alludes to the fact that, in the run-up to the planned Envoy Sage inspection, the County at least offered the Secretary a token gesture toward the imposition of an agreeable protocol. (In this regard, it is worth noting that at that time, the Secretary was attempting to negotiate to *allow* the inspection, provided the County's agreement to an acceptable protocol.) Because it was planned (continued…)

We agree. A court assessing compliance with its order may and indeed should view the words of the order in light of the terms and reasoning of the party seeking it and the procedural and real-world circumstances amid which it was issued.[145] That we require clarity as to the conduct proscribed to ensure that the contempt sanction is not imposed when the alleged contemnor in good faith may not have understood the order's scope does not warrant venerating form to a degree that makes a mockery of substance. That our case law requires us to interpret ambiguous language in favor of the alleged contemnor does not require us to treat as reasonable an interpretation of our order that would render it incompatible with the clear impetus for its issuance and, in case of the January 27, 2022 order, without any discernible effect.

---

and executed in secret, it follows trivially that the County made no such effort, token or otherwise, in connection with the Speckin inspection.

[145] Pennsylvania appellate courts typically review trial court contempt orders for an abuse of discretion, "plac[ing] great reliance on the sound discretion of the trial judge," and reversing only where "the trial court's conclusions are unreasonable as shown by the evidence of record." *G.A. v. D.L.*, 72 A.3d 264, 268-69 (Pa. Super. 2013). Appellate courts in other jurisdictions have deferred to lower courts' interpretations of their own orders when determining whether an alleged contemnor had sufficient notice and understanding of what conduct was proscribed to sustain a finding of contempt. *See In re Grand Jury Subpoena (T-112)*, 597 F.3d 189, 195 (4th Cir. 2010) (noting in review of civil contempt order that "district courts are in the best position to interpret their own orders"); *cf. In re Asbestos Prods. Liab. Litig. (No. VI)*, 718 F.3d 236, 243 (3d Cir. 2013) (noting that the court reviews with deference a district court's interpretation of its own orders); *Ala. Nursing Home Ass'n v. Harris*, 617 F.2d 385, 388 (5th Cir. 1980) ("Great deference is due the interpretation placed on the terms of an injunctive order by the court who issued and must enforce it."); *Commercial Union Ins. Co. v. Sepco Corp.*, 918 F.2d 920, 924 (11th Cir. 1990) (granting "deference on appeal" to the district court's construction of earlier order). This principle does not bear directly upon a court of last resort assessing compliance with its own order. But they incline us toward accepting the findings and conclusions of the Special Master, who assessed witnesses' credibility based upon observations of live testimony. The interpretive deference principle also reinforces a practical approach to interpreting the thrust of allegedly violated orders: no interpretive deference is called for if discerning an order's scope through the eyes of a party bound by it was merely mechanical.

We can reaffirm our authority to proscribe conduct temporarily in the interests of justice or we can reward parties who play dumb to circumvent the proscription. But we cannot do both. We choose the former. We agree with the Special Master that the County deliberately, willfully, and wrongfully violated this Court's temporary order when it allowed Speckin to inspect the voting equipment, the condition of which is material to the underlying litigation. Accordingly, we adopt the Special Master's recommendation that this Court hold Fulton County in contempt of this Court.

### B. The Sanctions Proposed by the Special Master

The Special Master recommends that this Court impose several sanctions upon Fulton County specifically for contempt. First, the Special Master proposes that, as a compensatory sanction, we direct Fulton County to reimburse the Secretary for counsel fees and costs incurred from the effective inception of the underlying protective order litigation that has led us to this pass. The Special Master identified the relevant trigger date as December 17, 2021, the date upon which the Secretary filed the first Emergency Application to enjoin the County's proposed Envoy Sage inspection.[146]

Because we grant counsel fees to compensate the aggrieved party whose interests the violated order was intended to protect, December 17 is the proper trigger date, because it is then that the Secretary endeavored—ultimately successfully—to gain a degree of temporary protection for evidence that it believed might be relevant to its defense. Given what happened in the year to come, that is also precisely when the Secretary began throwing money in a well, for all the good it ultimately did. When the County violated our order in July, it necessarily compromised the evidentiary value of the

---

[146]    *See* SMR at 69-70 ¶¶28-30.

equipment for assessing its condition immediately after the Wake TSI inspection, precisely what the Secretary sought to preserve. The Secretary's first filing in furtherance of that goal was the December 17, 2021 Application. Later, our temporary order provisionally validated the Secretary's concern and preserved the *status quo* while we deliberated over whether the protective order should have been granted by the Commonwealth Court in the first place. The July inspection not only led to the instant sanction proceedings, it also rendered nugatory every dime the Secretary spent to protect those machines in the preceding eight months. Accordingly, we agree that Fulton County must reimburse all of the fees and costs the Secretary incurred in securing the protections that it has now lost irretrievably due to the County's flagrant violation of our stay order.[147]

The Special Master also proposes to ensure that Fulton County cannot again compromise the integrity of the machines. While it appears undisputed that the horse left the barn as soon as Speckin tapped into the voting equipment, we know what we do not know, and this Court will give the Secretary the benefit of our uncertainty. We will not assume that there is no scenario in which the present condition of the voting equipment may prove relevant to one or more of the County's claims, and at this point the County has given us no reason to trust that it will honor a mere reiteration of the same order it disregarded before. The Special Master proposes that we direct the County to transfer the voting equipment to "the custody and control of a neutral escrow agent pursuant to an agreement between the County, Dominion, and the escrow agent. The escrow agent

---

[147] Like the Special Master, we decline to impose sanctions on Attorney Carroll for contempt of court specifically. But we do so for other reasons set forth below.

would hold the Dominion Voting Equipment in trust until further order of court."[148]  The Special Master further specified that the County would bear the expense of the impoundment.

Taking the County at its word, it is unclear what prejudice impoundment would cause.  The County insists, with increasing volume as this case has evolved, that it has no interest in the equipment that it now identifies as "defunct."  Further, it disclaims any intention to use the equipment again.  And the County provides no specific reason why the equipment would have any value to assessing the security of future elections using other companies' products.  Any other utility would be associated with the County's other litigation interests, which can be dealt with as they arise; they are of no moment to the issue at hand.

Whether or how discovery required by these sanction proceedings affects the County's interests in another lawsuit does not affect the Secretary's entitlement to a full accounting of non-privileged evidence that is discoverable under the circumstances of this proceeding.  And even if we were receptive to the argument, the County has never explained *how* its litigation interests in any other case are disserved, nor has the County availed itself of several opportunities to do so in appropriate detail.  Moreover, any party, including Fulton County, is free to seek a continuance or other relief from any court in which it is actively litigating based upon the unfortunate situation it has brought upon itself here.  But we do observe that the pending litigation requires us to clarify what court may release or allow access to the impounded equipment.  We will entrust exclusive authority to end or modify the impoundment to the judge presiding over the underlying Petition for

---

[148]     *Id*. at 73 ¶39.

Review after the impoundment is completed under the supervision of the Special Master. That court shall consider any such requests in light of our discussion in this Opinion. The Commonwealth Court's exclusive authority naturally will pertain to requests associated with the County's Petition for Review. To ensure subsequent continuity in the chain of custody and the protection of such evidentiary value as the voting equipment may retain, the Commonwealth Court's authority must also encompass requests associated with any other pending proceeding, including the County's contract action against Dominion. As always, any party that is aggrieved by an impoundment-related order may seek emergency relief in this Court.

As noted earlier, the Special Master does not recommend that this Court grant the Secretary's requested sanction of directing dismissal of the County's underlying Petition for Review.[149] We agree. To grant that sanction would cross the line between a coercive and punitive sanction, which lies outside the bounds of a civil contempt proceeding. Moreover, notwithstanding the presence of potentially fact-dependent claims, the County's Petition for Review includes pure questions of law pertaining to the Secretary's authority that may be resolved without recourse to the compromised evidence. Settling these legal questions will serve not only the parties but the Commonwealth generally. While we must hold the County to account for flouting our order, we will not deny its day in court on its duly raised, purely legal claims concerning the complex balance of state and local power over elections and the equipment used in election administration.

Instead, the Special Master recommended that this Court order that, "to the extent any fact relating to the effect of any inspection on the Dominion Voting Equipment is or

---

[149]     *See id*. at 70-72.

becomes relevant in the underlying litigation, that fact will be conclusively established in the Secretary's favor."[150] The Master elaborated that this was strictly compensatory in nature, granting the Secretary the benefit of every potentially favorable inference that the County's malfeasance made impossible for the Secretary to establish by conventional proof.

While we do not disagree with the Special Master's reasoning or the essential fairness of the proposal, we decline to grant this sanction. First, the undisputed testimony regarding the degree to which the Speckin inspection compromised the evidentiary benefit of the machines to resolving the underlying litigation renders it unlikely that the County will gain much support in furtherance of its burden as Petitioner of proving any disputed facts necessary to sustain one or more of its claims. Second, its ability to do so will be limited by the impoundment of the equipment. Finally, we are reluctant to direct the fact-finder in the underlying litigation to resolve factual disputes in any particular way for fear of intruding unnecessarily upon that court's discretion. Any alleged problems in how the lower court deals with factual disputes involving the voting equipment as the underlying litigation progresses can be raised, if necessary, on appeal.

### C. The Special Master's Alternative Bases for the Imposition of Monetary Sanctions and Their Application to Attorney Carroll

The Special Master finds additional support for the sanctions she recommends in rules that do not require a finding of contempt. First, she reviews and relies upon the Judicial Code, 42 Pa.C.S. § 2503 ("Right of participants to receive counsel fees") and Pa.R.A.P. 2744 ("Further Costs. Counsel Fees. Damages for Delay"), both of which, she

---

[150] *Id*. at 72 ¶35.

correctly observes, "target litigation conduct that is 'dilatory, obdurate, or vexatious.'"[151]

We find that both the County *and* Attorney Carroll are guilty of dilatory, obdurate, *and* vexatious conduct, as well as conduct in bad faith.

Separately, the Special Master found a basis to sanction the County in Pa.R.Civ.P. 4019, which authorizes the imposition of sanctions, including counsel costs and fees, when (among many other things) a party fails "to obey an order of court respecting discovery." Relatedly, as the Commonwealth Court noted in its opinion denying the Secretary's request for a protective order, courts have inherent authority to sanction parties for spoliation of the evidence.[152]

---

[151] *Id*. at 74 ¶41; *see* 42 Pa.C.S. § 2503 (authorizing the award of counsel fees for "(7) [a]ny participant who is awarded counsel fees as a sanction against another participant for dilatory, obdurate or vexatious conduct during the pendency of a matter" and "(9) [a]ny participant who is awarded counsel fees because the conduct of another party in commencing the matter or otherwise was arbitrary, vexatious or in bad faith"); Pa.R.A.P. 2744 (authorizing an appellate court to award "a reasonable counsel fee and . . . damages for delay . . . if it determines . . . that the conduct of the participant against whom costs are to be imposed is dilatory, obdurate or vexatious"). This Court has held that there must be an appeal, as such, before Rule 2744 sanctions may be imposed. *South Strabane v. Piecknick*, 686 A.2d 1297, 1300 (Pa. 1996). Here, the Special Master's findings focus more or less exclusively on the County's actions associated with the Speckin inspection as a violation of this Court's temporary order, which, arising out of and serving to preserve the integrity of a pending appeal, appropriately is the subject of Rule 2744. However, we do not sanction Attorney Carroll based upon the inspection itself. We lack the record to determine his direct culpability for his clients' behavior in this regard. Instead, we impose sanctions primarily for his conduct throughout these sanction proceedings, which is not an appeal, as well as for his similarly vexatious conduct associated with the appeal, itself. Whether it is most fair to associate Attorney Carroll's persistent misconduct with the underlying appeal, the instant sanction action, or some combination of the two, corresponding sanction authority for his "dilatory, obdurate, or vexatious conduct" will be found in either provision. The Secretary filed numerous applications for sanctions calling out such misconduct as it occurred. Because the Special Master held all of these in abeyance, they remain open for disposition. We award no relief that has not been sought by the Secretary.

[152] *See* Memo. & Order, 1/14/2022, at 5 ("Even if the inspection does affect evidence later used in this case, sanctions discourage spoliation."); *see also id*. at 3 (citing cases (continued…)

The Special Master offered the following analysis, which we adopt:

> 42. The Commonwealth Court recently described the meaning of [the terms dilatory, obdurate, and vexatious], for purposes of fee awards under the Judicial Code, as follows:
>
>> "**Vexatious** conduct is 'without reasonable or probable cause or excuse; harassing; annoying.'" According to the Pennsylvania Superior Court, generally speaking, '**obdurate**' conduct may be defined in this context as 'stubbornly persistent in wrongdoing.' Webster's Ninth New Collegiate Dictionary 815 (1987). Conduct is '**dilatory**' where the record demonstrates that counsel displayed a lack of diligence that delayed proceedings unnecessarily and caused additional legal work. *In re Est. of Burger*, 852 A.2d 385, 391 (Pa. Super. 2004) (emphasis added), *aff'd*, 898 A.2d 547 (Pa. 2006).
>
> *MFW Wine Co.*, *LLC* v. Pa. LCB, 276 A.3d 1225, 1240 (Pa. Cmwlth. 2022) (cleaned up).
>
> 43. Additionally, Section 2503(9) of the Judicial Code allows imposition of fees and costs for conduct that is "otherwise . . . in bad faith." "The term 'bad faith' used in Section 23503(9) of the Judicial Code means 'fraud, dishonesty or corruption.'" *MFW Wine*, 276 A.3d at 1240.[153]

The Special Master found that the County acted vexatiously in allowing the Speckin inspection because it had no reasonable excuse and compromised the Secretary's interests in preserving the evidence. It acted obdurately insofar as Commissioners Ulsh and Bunch acted with wrongful intent in violating the order. And bad faith was evident in the secrecy Commissioners Ulsh and Bunch preserved around their actions, making

---

and Pa.R.Civ.P. 4009.1 explaining spoliation sanctions generally and specifically pertaining to the standard that applies to spoliation of electronically stored evidence). Notably Fulton County agreed on this point, and, like the Commonwealth Court, cited the availability of sanctions after the fact as a basis for denying the protective order and a stay pending appeal. *See* Answer to Respondent/Appellant's Emergency Application (Supreme Court) at 7-8 (citing Memo & Order at 3 approvingly). In so many words, the County itself said that if it did precisely what it ultimately did, we could impose sanctions. We agree.

[153]     SMR at 74-75 (cleaned up, citations modified; emphasis in original).

every effort to avoid the scrutiny of anyone who might question or object to their actions, including their fellow Commissioner Shives.[154]

Regarding Rule 4019 and the court's inherent power to impose sanctions for spoliation of evidence, the Master reiterated that the manifest purpose of the order was to preserve the electronic evidence against spoliation during the pendency of the appeal. Based upon the facts and intent underlying the recommended finding of contempt, the Master found as well that these bases for an award of counsel fees operated to support the recommended grant of sanctions.[155]

As a function of its defense strategy, the County offers no material argument against any of those rules' application except the above-rejected categorical defense to the charge that its conduct violated the protective order at all. With specific regard to the County, we adopt as our own the Special Master's reliance upon the same findings cited in support of contempt, and we refer the reader to her discussion. The sanction authority of these rules as applied specifically to the County is academic; it works redundantly with the sanctions for contempt.

Although we will not impute the County's contempt, as such, to Attorney Carroll directly, we do not overlook the fact that the County's violation occurred squarely during his watch—indeed, months after his appointment by the County and weeks after he had entered his appearance in the Commonwealth Court in the underlying litigation. It is difficult to believe that Attorney Carroll was ignorant of the events preceding and culminating in the Speckin inspection. Certainly, the inspection came to his attention by

---

[154]    *Id*. at 76 ¶46.

[155]    *Id*. at 76-77 ¶¶48-50.

September 2022, when he filed the County's contract claims against Dominion, which relied heavily on the Speckin report. Aware as Attorney Carroll was (by then at least) of the underlying appeal in this litigation as well as the Secretary's and Dominion's claims of entitlement to advance notice of any inspection, we find notable that he determined that the inspection warranted no action relative to this appeal, such as the belated provision of notice to the Secretary, Dominion, or, for that matter, the courts engaged in aspects of this litigation. Similarly suggestive is the fact that, *immediately* after terminating the representation of prior counsel and appointing Attorneys Carroll and Lambert as special counsel in this matter on April 12, 2022, Commissioner Ulsh signed out the key to the locked room where the voting equipment was stored, a key which he did not return until shortly after the Speckin inspection.

Perhaps more importantly, once informed of these events, the Secretary filed the instant Sanctions Application, the detail, rigor, and potential merit of which revealed to Attorney Carroll (if he didn't know already) the gravity of the County's behavior as well as his own potential exposure. Despite being given every opportunity to participate in good faith in the proceeding, Attorney Carroll incessantly transgressed the bounds of zealous but ethical advocacy. He serially raised the same arguments before both the Special Master and directly to this Court, long after it was clear that neither would grant the relief he sought.

We never foreclosed the County's right to raise appropriate, particularized objections to the Secretary's discovery requests as specified by Special Master. This Court and the Master granted multiple extensions to facilitate the County's exercise of this right. Instead of adhering to these parameters, Attorney Carroll repeatedly tied up

the Special Master, this Court, and the parties with prosaic eleventh-hour filings that drew resources and attention away from these and other proceedings.

Then there are Attorney Carroll's transparent efforts to delay the hearing itself. First, he insisted that it be delayed until November 9 to make room for his own vacation. Then, on the eve of that hearing, he contended that Commissioner Ulsh would be unable to attend the hearings due to *his* departure for vacation on November 8, which was Election Day. Meanwhile, as the November 7 and 8 depositions of the Commissioners approached—depositions that, themselves had already been delayed by Attorney Carroll's refusal to honor the Special Master's orders on their own terms—Attorney Carroll again attempted to subvert them. First, early on the morning of November 7, he filed a lengthy, but by then cookie-cutter brief again contending that all discovery was improper until the Special Master or the full Court ruled on his categorical defense or his improperly rendered, categorical objections to the Secretary's discovery requests.

Even more significantly, Attorney Carroll also argued that correspondence from the Secretary issued the preceding Friday, November 4, concerning a temporary breakdown in the statewide SURE system required the Commissioners' attention during the time scheduled for their depositions. But it quickly emerged that, not only had the system been restored in full early on the morning of Saturday, November 5, but also that Fulton County itself had printed out its poll books utilizing the system later that same Saturday. By the time Attorney Carroll claimed that the Secretary's letter precluded his clients' depositions on Monday, the problem the letter identified had been solved for days. Attorney Carroll either failed to figure this out for himself or knowingly used a specious claim as a pretext to further jam up these proceedings.

The same morning, Attorney Carroll asserted that Commissioner Ulsh could not appear at the hearing on November 9 because of his general election duties. But just three days earlier Attorney Carroll had told the Special Master that the same commissioner could not appear on November 9 because he was scheduled to depart for vacation *on Election Day*.

Moreover, while Attorney Carroll apparently timely informed Commissioners Ulsh and Bunch of their obligations to appear for their depositions and the hearing per timely deposition notices served by the Secretary upon Attorney Carroll for his clients, he did not timely convey notice of these obligations to Commissioner Shives, who was no less subject to sanctions for failing to appear than her fellow commissioners. Attorney Carroll offered no satisfactory answer for the oversight, and we would be naïve to overlook the fact that what distinguished Commissioner Shives from her co-commissioners was her persistent refusal to go along with the County's efforts to investigate the 2020 general election as well as her willingness to testify fully to various matters as to which Commissioners Ulsh and Bunch ultimately invoked their Fifth Amendment rights against self-incrimination. Still, Attorney Carroll got what he wanted. His relentless efforts to delay the proceedings, his clients' failures to be available at the time and place specified in their notices of deposition (Commissioner Shives for reasons outside her control but within Attorney Carroll's), and the time constraints we imposed upon the Special Master's proceedings made it impossible to conduct the depositions in a way that preserved the Master's schedule, with the result that the evidentiary hearings took considerably longer to complete than they might have taken.

Attorney Carroll's conduct did not much improve during the hearings themselves, which proceeded as scheduled despite his best efforts. Although the Special Master declined to dwell on this in her Report, our review of the record reveals that Attorney Carroll frequently derailed and delayed the proceedings through a combination of dubious objections, lines of questioning on irrelevant subjects, and legal digressions and conspiratorial hypotheses with little discernible bearing upon the matter at hand.[156] To their credit, the Special Master and counsel for the Secretary displayed admirable patience by humoring rather than challenging many of these, not to mention Commissioners Ulsh and Bunch's dubious invocations of the Fifth Amendment in response even to questions the answers to which either were subject to judicial notice or could not plausibly implicate them in criminal behavior.

---

[156] For example, Attorneys Lambert and Carroll both repeatedly suggested that their clients would invoke the Fifth Amendment specifically for want of an immunity agreement regarding, on their own account, the legally defensible conduct of inspecting their voting equipment in furtherance of their statutory duties, because there were "statements that are coming from [then-Attorney General] Shapiro's office they could potentially be charged with a crime" for such conduct. N.T., 11/9/2022, at 23 (Attorney Lambert); *see id.* at 49 (Attorney Carroll: "[Attorney] Wiygul used the term conspiracy theorist today in court. And we all know that they are saying that the Department of Justice and also our current Attorney General are investigating people for criminal—alleged criminal behavior based on their term election conspirator."). Attorney Carroll similarly asserted that "the DOJ has clearly set up standards for what they are saying is prosecutable under their investigations that are ongoing. They've made these statements from the Department of Homeland Security and Department of Justice, that would indicate that there is a high likelihood of a potential—of criminal charges." *Id.* at 50-51. Fulton County has never provided any evidence that this is the case, or more importantly that it applies to any of the conduct at issue in the underlying litigation, even construed least favorably to the Commissioners. Notably, this last quotation, as Attorney Wiygul observed, came in defense of Commissioner Ulsh's invocation of the Fifth Amendment rather than authenticate the Voting System and Management Services Agreement between Fulton County and Dominion, the authentication of which could on no reasonable account lead to criminal liability, even assuming the truth of Fulton County's unsubstantiated accounts regarding the investigatory intentions and activities of the United States Department of Justice, the Pennsylvania Office of the Attorney General, and others.

There are credible assertions that Attorney Carroll was taking dictation from Attorney Lambert for substantial periods of the hearing. And this appears to have been an *ad hoc* work-around to avoid the intended limiting effect of the Special Master's denial of *pro hac vice* admission to Attorney Lambert because Attorney Carroll filed motions to admit her that manifestly failed to conform to the applicable rules—*twice*. Neither motion acknowledged the sanctions imposed upon Attorney Lambert in the Michigan *King* litigation *or* the disciplinary grievance registered by the judge in that case, despite the fact that the governing rule arguably requires the first and unequivocally requires the second. And when repeatedly challenged on these omissions, Attorneys Carroll and Lambert both attempted to gloss over the omissions by noting Attorney Lambert's *present* good standing with the Michigan bar.[157]

Having said all of the above, it hardly matters that we could find further sanctionable conduct under Pa.R.A.P. 4019 in Attorney Carroll's management of the underlying appeal. There, too, an unmistakable pattern emerged. He repeatedly failed to acknowledge this Court's rules, orders, and directions in matters both procedural and substantive. Most notably, he never filed a supplemental brief on the jurisdictional question that we deemed important enough to seek argument on *sua sponte*—even after this Court, *at his request*, forgave his first two failures to do so by granting him another extension to the date he requested. Worse still, in invoking his then-recent formal entry of appearance in this Court as an excuse for his various failures to satisfy his obligations

---

[157]     *Id*. at 26 (Attorney Lambert: "I would just like to say that I'm not disputing that I was grieved. I have not been disbarred or disciplined by the State Bar of Michigan. In fact, I am in good standing . . . . I absolutely agree that the [*King*] Court issued an order that sanctioned me and a number of attorneys.").

before this Court, he led this Court to believe that he had not had time to come up to speed on the case. In omitting to mention in late July that he had been special counsel for the County since mid-April and had actively engaged in the underlying litigation one month earlier, he brazenly misled this Court about his ability to have adhered to this Court's orders. Alternatively, he had ample time to recognize his limited capacity and to associate additional counsel to ensure that none of the "chainsaws" he was juggling would drop.[158]

In sum, we find that Attorney Carroll, both in tandem with and also independently of his clients, is guilty of relentlessly dilatory, obdurate, vexatious, and bad-faith conduct before this Court and the Special Master, especially, but not exclusively, during these sanction proceedings. Consequently, it would be inequitable that the County alone should bear the Secretary's costs. Attorney Carroll, too, should be sanctioned in the form of joint and several responsibility for the Secretary's counsel fees during the period for which he shares responsibility for the misconduct.

We will not mark Attorney Carroll's liability from the December 17, 2021 inception of the protective order litigation before he assumed the mantle of special counsel. But the County's contumacious conduct occurred during Attorney Carroll's tenure. Accordingly, we find Attorney Carroll jointly and severally liable with Fulton County for all costs and fees assessed in favor of the Secretary and Dominion from April 13, 2022, the first full day after his and Attorney Lambert's appointment as special counsel for the

---

[158] *Id*. at 22 (Attorney Lambert, noting that "we're juggling chainsaws here" as an explanation for her failure to file a *pro hac vice* petition at least three days before the November 9, 2022 hearing, two weeks after it was scheduled, three months after Attorney Carroll entered his appearance in this Court, and more than six months after her appointment by the County).

County, through the conclusion of these sanction proceedings, including proceedings necessary to determine the reasonable fees to which the Secretary is entitled.[159]

As well, we refer Attorney Carroll to the Pennsylvania Attorney Disciplinary Board for further examination of his conduct throughout the litigation of the appeal of our stay order and throughout these sanction proceedings. We neither urge nor assume any particular disciplinary outcome. We opine simply that Attorney Carroll's conduct warrants the independent review of his fellow practitioners.

### D. Regarding Attorney Stefanie Lambert

Attorney Lambert may be every bit as culpable as Attorney Carroll, at least in the pattern of non-compliance that has led us to impose upon him joint and several responsibility with the County. That said, perhaps ironically, we must conclude that the failure by the two lawyers to convince the Special Master that Attorney Lambert should be admitted *pro hac vice* precisely because she failed to satisfy the requirements for applying for that status protects her from sharing responsibility with Attorney Carroll and the County. Had she gained admission, the result might have been different.

---

[159] While we held this matter under advisement, on November 18, 2022, the Secretary filed with the Special Master a petition seeking counsel fees associated with the depositions that Attorney Carroll and his client failed to facilitate consistently with the Special Master's direction and the Secretary's notices. The County did not oppose the petition. On December 29, 2022, the Master issued an order granting the Secretary's petition in the amount specified. We adopt this order as our own, but consistently with our imposition of joint and several responsibility for all counsel fees after April 13, 2022, we modify it to make Attorney Carroll jointly and severally liable for the amounts specified. We further observe that the Special Master should take care not to incorporate fees already awarded in calculating the larger award of counsel fees on the referral associated with this Opinion. As well, this award should not be held against Dominion, which, as set forth below, is entitled to its own counsel fees associated with the depositions.

But we are not powerless to call attention to Attorney Lambert's own role in the misconduct highlighted above. In *King*, the judge referred Attorney Lambert and co-counsel to disciplinary review both in Michigan and anywhere else they were licensed.[160] We will do the same, transmitting a copy of this Opinion to the Michigan Attorney Grievance Commission.

### V. Intervenor Dominion's Application for Costs and Fees

Shortly after the Special Master submitted her Report to this Court, Dominion as intervenor filed an application to recover its own costs associated with the litigation of the protective order and all that has followed. Dominion argues that it is entitled to recoup its costs because the County's initial retention of Wake TSI to inspect the Dominion election equipment violated its contractual rights, and because the County's later effort to enable an additional inspection by Envoy Sage, as well as the ultimate inspection conducted by Speckin in violation of this Court's stay burdened its own interests and necessitated costly litigation, ultimately for naught. Although Dominion's interest lay in proprietary concerns rather than election integrity, its own objectives somewhat aligned with the Secretary's, and so Dominion benefitted equally from this Court's protective order. Consequently it, too, was prejudiced by the County's violation of the protective order.[161]

---

[160] 2021 WL 5711102, at *1 n.1.

[161] *See* Dominion's Application for Costs and Fees at 18-19 (quoting SMR at 63 ¶8) ("In granting an injunction pending appeal on such narrow issues, the Supreme Court obviously intended to preserve its ability to render an appellate decision that was meaningful. And any subsequent inspection of the Dominion Voting Equipment would moot out that appeal and prevent a meaningful resolution of those issues on appeal. ***Those issues were <u>Dominion's right to protect its property</u> and the Secretary's right to preserve evidence for her defense, which both depended entirely upon preventing further inspection of the Dominion Voting Equipment***." (Dominion's emphasis)).

Fulton County filed a no-answer letter, offering no rebuttal of Dominion's claims. It is not our job to make such arguments in the County's stead, and we can think of no distinction between the Secretary's and Dominion's overarching interests in the County's compliance with our order.

Accordingly, we find that Dominion's posture and entitlement to sanctions is materially identical to the Secretary's, so Dominion also is entitled to recover its counsel fees subject to the terms and limitations described above. It, too, may recover its reasonable counsel fees associated with the protection of the voting equipment incurred since December 17, 2021, through the conclusion of the instant sanction proceedings. And it may seek to recover fees from April 13, 2021 forward from the County and Attorney Carroll jointly and severally.

## VI.     The Effect of This Court's Sanctions Ruling Upon the Pending Appeal

Because we direct the impoundment of the voting equipment implicated by the County's Petition for Review, effectuating the same result the Secretary sought when it first asked the Commonwealth Court for a protective order, the interlocutory appeal of the Commonwealth Court's denial of the protective order is moot. Thus, neither the jurisdictional question it presented nor the merits of the Secretary's appeal require further consideration. Accordingly, we dismiss the Secretary's appeal. We retain jurisdiction just as to the sanction proceedings while they proceed to their final resolution.

## VII.     Conclusion

As an independent and coequal branch of the Commonwealth's government, the judiciary is as entitled to strict adherence to its mandates as the General Assembly or the executive branch. When an individual or a private or public entity deliberately violates a

court order, such violation constitutes a clear and present danger to the effective function of the judiciary, the orderly administration of justice, and the rule of law. When such a violation passes without consequences equal to its gravity, we can anticipate violations of increasing frequency.

Furthermore, such violations not only threaten the authority of the court, but also impose hardships and prejudice upon the party or parties the court intended to protect. This case illustrates the fact that the risk of such harm is neither hypothetical nor abstract. The County's persistent efforts to surrender its machines to third parties of dubious qualifications for audits of unclear scope and intent impair resolution of the very legal question the County sought to litigate in the first place—potentially adversely to the Secretary's ability to mount a defense against the County's allegations. Furthermore, the extensive ancillary litigation these actions forced the Secretary to undertake—beginning with the initial efforts to protect the machines against such incursions and continuing through these sanction proceedings—were necessitated only by such efforts.

No remedy can undo the harm that the County's contempt caused its counterparties, nor can any sanction un-compromise the ongoing litigation of the County's Petition for Review. The sanctions we impose, informed by the thorough, thoughtful, and persuasive analysis of the Special Master, simply are the next best thing. They will make the parties and their attorneys whole for what proved to be time wasted on securing a protective order that the County ultimately flouted in categorical derogation of the order's animating goal. And we can hope that the sanctions will underscore for the County, Attorney Carroll, and other observers that they trifle with judicial orders and time-honored rules and norms in litigation at their peril.

* * * *

In summary, we dismiss the underlying appeal because we find that the impoundment of the machines to follow constructively grants the relief the Secretary sought in that appeal. Regarding impoundment, we direct the parties to confer and agree on a neutral third-party escrow agent to take and retain possession of the voting equipment until further order of court, and we direct the Special Master to see that this task is completed—and to appoint a neutral agent if the parties cannot agree on one. The County is responsible for all costs associated with the impoundment. Any effort to seek access to, or release of, the voting equipment must be directed to the Commonwealth Court, specifically whoever is then presiding over the County's underlying Petition for Review against the Secretary.

Finally, Fulton County shall compensate the Secretary for all protective-order and sanctions-related counsel fees in the Commonwealth Court and this Court from December 17, 2021, forward. Attorney Carroll shall be jointly and severally responsible for those fees from April 13, 2022, forward.

Assessing legal fees and the costs of litigation requires a fact-intensive inquiry assisted by the Secretary of State's and Dominion's submissions. Accordingly, we return this case to President Judge Cohn Jubelirer to collect and review the parties' submissions, including the County's disputes, if any, of the amounts claimed. Once the Special Master has completed this task, she will return to this Court findings and recommended fee awards along with an accounting of all relevant data and calculations employed in the task, separating the counsel fees incurred by the Secretary and Dominion

between December 17, 2022, and April 12, 2022, and those incurred by each party thereafter.

The need for expedition in the calculation of fees is perhaps not on par with what the sanctions review itself called for.  We trust that the Special Master will fashion a schedule for all necessary proceedings that is compatible with the needs of this case and her other duties.[162]

Chief Justice Todd and Justices Donohue and Dougherty join the opinion.

Justice Dougherty files a concurring opinion.

Justice Mundy concurs in the result.

Justice Brobson files a concurring and dissenting opinion.

---

[162]    Inasmuch as we are calling on her services again, we take this opportunity to thank President Judge Cohn Jubelirer for assuming the considerable burdens this proceeding has presented with no advance warning and on an abbreviated schedule, and for answering the call vigorously and without compromise.